# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**TEMUJIN KENSU,**

    *Plaintiff,*

v.

**CORIZON, INC.,**
**PATRICIA SCHMIDT**
    In her individual capacity,
**KEITH PAPENDICK**
    In his individual capacity,
**RICKEY COLEMAN**
    In his individual capacity,
**EUTRILLA TAYLOR**
    In her individual capacity,
**MINNIE MARTIN**
    In her individual capacity,
**WILLIAM BORGERDING**
    In his individual capacity,
**RANDALL HAAS**
    In his individual capacity,
**GEORGE STEPHENSON**
    In his individual capacity,
**CHRIS STEECE**
    In his individual capacity,
**DARRELL STEWARD**
    In his individual capacity,
**LIA GULICK**
    In her individual capacity,
**LORI KISSAU**
    In her individual capacity,
**JEFFREY BOMBER**
    In his individual capacity,
**ROBERT LACY**
    In his individual capacity,
**KIM FARRIS**
    In her individual capacity,

Case No.: 2:19-cv-10616
Hon. Linda V. Parker

**RICHARD RUSSELL**
    In his individual capacity,
**LISA ADRAY**
    In her individual capacity,
**ANGELA FORTESCUE**
    In her individual capacity,
**PATRICIA WILLARD**
    In her individual capacity,
**PATRICK WARREN**
    In his individual capacity,
**HOWARD TYREE**
    In his individual capacity,
**JOSHUA BUSKIRK**
    In his individual capacity,
**GINA COUTURIER**
    In her individual capacity,
**RAMESH KILARU**
    In his individual capacity,
**PENNY RODGERS**
    In her individual capacity,
**REGINA JENKINS-GRANT**
    In her individual capacity,
**AMIE JENKINS**
    In her individual capacity

    *Defendants.*

_____/

EXCOLO LAW, PLLC
Keith Altman (P81702)
Solomon M. Radner (P73653)
Albert J. Asciutto (P82822)
Attorneys for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 939-2656
_____/

## PLAINTIFF'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS UNDER THE FIRST, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................6

JURISDICTIONAL ALLEGATIONS AND PARTIES ........................................17

THE DEFENDANTS..................................................................................18

COMPLIANCE WITH PRE-EXHAUSTION REQUIREMENTS .......................25

GENERAL ALLEGATIONS .........................................................................25

   A.   Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Benign Prostatic Hypertrophy................................................26

   B.   Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Orthopedic Needs..........................................................29

   C.   Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Rheumatological and Immunology Needs............................35

   D.   Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Ear, Nose, Throat, and Breathing Needs................................37

   E.   Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Neurological Needs..........................................................38

   F.  Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Diet Needs....................................................................39

   G.   Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Defendant's Deprivation of Plaintiff's Medical Device Property.......................41

ADDITIONAL DEFENDANT-SPECIFIC ALLEGATIONS ................................43

   A.   Allegations Applicable to Each Defendant Listed Below ..........................43

   B.   Defendant Corizon's History of Misconduct and Their Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs....................................45

   C.   Defendant Rickey Coleman's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs ...........................................................................50

   D.   Defendant Papendick's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs ....................................................................................57

   E.   Defendant Schmidt's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs ....................................................................................58

   F.  Defendant Borgerding's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs ....................................................................................64

G.    Defendant Martin's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs .................................................................................................65

H.    Defendant Farris's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................67

I.    Defendant Jenkins's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................69

J.    Defendant Taylor's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................73

K.    Defendant Warren's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................76

L.    Defendant Haas's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................77

M.    Defendant Gulick's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................79

N.    Defendant Russell's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................80

O.    Defendant Willard's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................81

P.    Defendant Kilaru's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................81

Q.    Defendant Bomber's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................82

R.    Defendant Lacy's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................82

S.    Defendant Stephenson's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................83

T.    Defendant Steece's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................84

U.    Defendant Steward's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................84

V.    Defendant Kissau's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................85

W.    Defendant Adray's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................86

X.   Defendant Fortescue's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................86

Y.   Defendant Tyree's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................87

Z.   Defendant Buskirk's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................87

AA.  Defendant Couturier's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................88

BB.  Defendant Rodger's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct ...................................88

CC.  Defendant Jenkins-Grant's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct .....................89

CAUSES OF ACTION ....................................................................................89

RELIEF REQUESTED...................................................................................106

DEMAND FOR JURY TRIAL .......................................................................108

NOW COMES Plaintiff, TEMUJIN KENSU, by and through his attorneys, Excolo Law, PLLC, and for his Complaint against Defendants, hereby states the following:

## INTRODUCTION

1.       This is a civil rights action in which Plaintiff seeks relief for Defendants' past and ongoing violations of Plaintiff's civil rights as secured by 42 U.S.C. § 1983, the First, Eighth, and Fourteenth Amendments.

2.       Plaintiff Temujin Kensu ("Kensu") is a 55-year-old man who has been incarcerated in the Michigan Department of Corrections ("MDOC") for over thirty years. He has earned a reputation throughout the MDOC as a "troublemaker" due to his filing of numerous grievances and lawsuits aimed at enforcing proper conduct of prison officials and ensuring their adherence to the United States Constitution, in addition to engaging in litigation to ensure proper treatment for his numerous serious medical needs.  While it is undeniable that there are plentiful jailhouse lawyers who file numerous suits on behalf of prisoners, these lawsuits virtually always fail.

3.       In this aspect, Kensu has set himself apart from other prisoners by prevailing in some of his litigation. Kensu achieved a judgment in his favor against some MDOC officials in 1996 in the Michigan Western District Federal Court in *Kensu v. Cason*, 91-cv-00300-DWM.  Additionally, he prevailed in an Eighth Amendment litigation against five MDOC officials on March 28, 2016, achieving a verdict totaling $325,002.00, case number 13-cv-10279-VAR-DRG. Of the damages awarded by the jury, $285,000.00 was assessed as punitive damages intended to

punish the wrongful conduct of the MDOC and to deter similar conduct by others.

4.     While Kensu engaged in the past litigation to spur meaningful change and deter the defendants from continuing their harmful conduct, the verdict (unfortunately) has had the opposite effect; almost immediately after the verdict, the MDOC and Corizon, Inc., including many of the Defendants in the instant action, conspired to refrain from treating Kensu's serious medical needs, while at the same time attempting to protect themselves from future litigation. Following the verdict, Defendants began falsifying medical records and wrongfully denying Kensu's access to care. Falsifying medical records had come up repeatedly in 13-cv-10279-VAR-DRG where it had become abundantly clear that the defendants were doing the same thing, which partially explains the high punitive damages award.

5.     Although Kensu has previously filed an additional case in 2016 (*Kensu v. Borgerding*, 4:16-cv-13505), that case only concerns conduct which took place before June 30, 2017, which was the cutoff date for Kensu to amend his complaint in that matter. In its rulings concerning motions for summary judgment in *Borgerding* (ECF #  180 and 187), the Court determined that events that took place after the date of the second amended complaint (filed with the Court on June 30, 2017) were not part of the *Borgerding* case.

6.     After June 30, 2017, Kensu was formally diagnosed with numerous serious medical conditions, and as discussed below, each Defendant has acted to deny or unreasonably delayed Kensu evaluation and/or treatment.

7.     To the extent that the Court granted summary judgment on certain issues in

*Kensu v. Borgerding*, that ruling was based on what was known as of June 30, 2017. Defendants have continued to deny or unreasonably delay treatment for those conditions.

8.      For any issues relating to newly discovered or diagnosed conditions after June 30, 2017, these allegations are against all Defendants.

9.      To any extent that any Defendant is also a defendant in *Kensu v. Borgerding* (16-cv-13505) (Defendants Borgerding, Haas, Russell, Lacy, Gulick, Bomber, and Taylor), this Complaint's allegations concern Defendants Borgerding, Haas, Russell, Lacy, Gulick, Bomber, and Taylor's conduct following the filing of the second amended complaint in *Kensu v. Borgerding.* on June 30, 2017.  Against those Defendants, the allegations contained in this Complaint involve medical conditions diagnosed after June 30, 2017.

10.     To any extent that any Defendant was also a defendant in *Kensu v. Buskirk*, 2:13-cv-10279-VAR-DRG, but not a defendant in *Kensu v. Borgerding* (Defendants Buskirk, Tyree, and Kilaru), this Complaint's allegations concern those Defendants' conduct following the filing of the first amended complaint in *Kensu v. Buskirk* on February 12, 2013. Against those Defendants, the allegations contained in this Complaint involve medical conditions diagnosed after June 30, 2017.

11.     Because Defendants have complete control over Kensu's access to medical care, to the extent that Kensu was prevented from being diagnosed for specific medical conditions due to Defendants' withholding access to an appropriate medical professional, such as a rheumatologist or orthopedist, these delays should

cause that any statute of limitations that may apply are equitably tolled.

12.     Throughout his incarceration, Kensu has been repeatedly and continually abused by many MDOC and Corizon officials. This abuse became worse after he achieved the aforementioned verdict, as Defendants have combated Plaintiff Kensu through harmful retaliatory actions.

13.     Plaintiff uses the phrase "Defendants" because each Defendant named in this Complaint was (1) aware that Kensu had serious medical needs; (2) aware of Kensu's grievances and kites concerning his medical care; (3) either took direct action against Kensu or was aware of the actions taken against Kensu and failed to act as constitutionally required; (4) for Defendants with supervisory roles, failed to act to see that Kensu received constitutionally required medical care and thus approved of the actions of the other Defendants; and (5) aware of the actions and role of each other Defendant and either approved of or participated in those actions.

14.     Specifically, the Defendants, as is described herein, have taken affirmative steps in ensuring that Kensu did not receive medical care for his serious medical needs. To make matters even worse, they have prevented and blocked others from treating Kensu's serious medical needs.

15.     Further, Defendants have taken affirmative steps to ensure that medical devices that Kensu had in his possession and/or devices that other medical professionals had approved for him were taken away. These medical devices, which were approved by physicians to treat and alleviate conditions associated with Kensu's serious medical needs, were wrongfully removed, confiscated, or blocked from Kensu's use by Defendants in retaliation for his verdict, grievances, and other

litigation.  These past and continued actions by Defendants violate Kensu's First Amendment, Eighth Amendment, and Fourteenth Amendment rights, as Defendants are demonstrating deliberate indifference to Kensu's serious medical needs and continue to deprive him of his property without due process of law.

16.    Defendants have engaged in a long history of misconduct, unfair treatment, and deliberate indifference to Kensu's serious medical needs.

17.    This long history of misconduct, unfair treatment, and deliberate indifference to Kensu's serious medical needs is in retaliation against Kensu for his litigation against Defendants and the MDOC.

18.    For example, in 2016, a physician treating Kensu approved an extensive list of medical items that would be used to treat Kensu's serious medical needs. However, on July 6, 2016, during a meeting between Kensu and Corizon medical director Defendant Robert Lacy, Defendant Lacy, holding the list of physician-approved medical items, told Kensu he was going to deny ALL of the approved accommodations. Defendant Lacy mentioned Kensu's previous litigation during this meeting.

19.    This was not a difference of medical opinion. This was pure and simple retaliation, conspired previously by Corizon and MDOC employees. Defendants agreed to send in Defendant Lacy to address Kensu's list of medical needs for the purpose of denying each one and documenting each denial, regardless of whether Plaintiff Kensu needed any medical treatment or care. This was done in deliberate indifference to Kensu's serious medical needs, as retaliation for Kensu's verdict, and with cruel and evil intentions.

20.     Additionally, Kensu's personal property, including medical devices, was taken from him by Defendants without due process of law and for no legitimate reason.

21.     Further, Kensu has been told by MDOC staff that they have been instructed to not treat him for a number of his ailments. He has been told by MDOC staff that this instruction comes from Lansing as well as other agents, officers, directors, and employees of Defendant Corizon and the MDOC.

22.     As recently as June 2017, Kensu was told by Defendant Physician's Assistant Kim Farris that she was ordered by Defendant Borgerding, former Corizon Acting Chief Medical Officer, not to treat any of Kensu's serious medical needs.

23.     Further, on June 29, 2017, Kensu was told by Defendant RN Lisa Adray that, per Defendant Borgerding, Plaintiff Kensu was not to be given his previously approved hinged stabilizing knee brace, which was paid for the MDOC and shipped to Macomb Correctional Facility ("MRF") specifically for Kensu's use.

24.     When Kensu has attempted to challenge Defendants' wrongful conduct of denying him care through the filing of grievances and the appeal process, he was unsuccessful due to former MRF Grievance Coordinator Defendant Eutrilla Taylor preventing Kensu from accessing the appeals process. Defendant Taylor has explicitly told Kensu that she was doing so to prevent him from engaging in litigation, thereby attempting to stop him from properly exhausting all of his administrative remedies pursuant to the Prison Litigation Reform Act, ultimately blocking his access to the Courts.

25.     Throughout the period that Defendant Corizon has been treating prisoners

housed in the MDOC, Kensu was deprived of access to medically necessary treatment for his ongoing serious medical needs.

26.   Kensu has a long, documented history of many serious medical needs that affect his daily life. This history of serious medical need is documented via years of Kensu's requests for adequate treatment from Defendants.

27.   Kensu has suffered from, and continues to suffer from, many serious medical needs, including, but not limited to:

    A. Benign Prostatic Hypertrophy

    B. Severe Orthopedic needs, such as:

        i.   Painful and disabling arthritis of the neck with calcification, multiple bulging disks, spinal stenosis, and sphenoid sinusitis.

        ii.  Numerous back and spinal column diseases and disorders, including excruciatingly painful and often disabling spinal degenerative disk disease, disk compression, herniation, stenosis, Schmorl nodes, past fractures, straightening of the lumbar lordosis, and spondyloarthropathies.

        iii. Kensu also has suffered from, and continues to suffer from, numerous severe, painful and often disabling joint tears and damage that include:

            1. Tears of the rotator cuff with impingement in both shoulders;

      2.  X-ray confirmed osteoarthritis and edema with lesions of both knees with MRI confirmed tendon, ligament, bone and cartilage damage to the right knee; and

      3.  X-ray and exam confirmed damage to both ankles with documented and measured impingement in the left ankle caused by wedged, broken bone fragments from a never-treated prison work injury. Both ankles are significantly damaged, arthritic and painful.

   iv.  Kensu also has serious orthopedic medical needs concerning his shoulders and knees, including:

      1.  Tricompartmental osteoarthritis, significant joint damage, cysts, condylar fractures, lesions, ACL / PCL thinning, etc.

C.  Rheumatologic and Immunologic needs, such as:

   i.  Progressive muscle loss and wasting disorder.

   ii.  Denervation

   iii.  Severe Combined Immunodeficiency Syndrome (SCIDS)

D.  Ear, Nose and Throat needs, such as:

   i.  Nasal polyps, which hamper his breathing, eustachian tube defects, and significant hearing loss with extreme tinnitus.

E.  Neurological needs, such as:

   i.  A brain tumor located in the 4th ventricle region near the base of the brain at the spinal junction.

    ii.  As a result of his brain tumor, in addition to the previously referenced multiple bulging disks, stenosis and sinusitis of the sphenoid region, Kensu frequently experiences severe, excruciating, and often debilitating migraines.

F.  Diet needs, such as:

    i.  A special medical diet to address many of Kensu's serious health issues. This diet is meant to control and treat Kensu's severe food intolerances and mitigate inflammation and symptoms of his serious medical needs.

G.  Bowel needs, such as:

    i.  Dysentery colitis, multiple impactions requiring emergency surgery to remove nearly two feet of Kensu's sigmoid colon, additional complications and hospitalizations lasting years, post-surgical ileus, edematous tissue (i.e., inflamed, scar-like tissue that could be cancerous), and extremely low motility with blockages requiring daily colonic lavage to permit evacuation.

H.  Medical Device Property needs, such as:

    i.  Several accommodations and recommendations over the years to use medical devices to treat Kensu's various ailments because of his serious medical needs.

    ii.  These accommodations and recommendations include ankle sleeves, corrective shoes, and braces, among many others.

28.    For years, Kensu has experienced tremendous pain and other issues as a

result of these serious medical issues. For years, Kensu has requested from Defendants treatment for his serious medical needs. For years, Defendants have denied Kensu's requests for treatment of his serious medical needs.

29.     For many of Kensu's serious medical needs, Defendants routinely deny Kensu access to medical devices that would provide treatment, in addition to denying Kensu access to specialists to provide proper expert evaluation.

30.     While Kensu was once provided with medical accommodations, such as pain relief, supportive shoes, gel and arch insoles, ankle sleeves, joint compounds, and a referral for surgical repair of the left ankle, in retaliation for engaging in litigation, Defendants have now denied any care and consideration for many of these painful, disabling disorders.

31.     Despite the standard of care requiring Defendants to treat Kensu's serious medical needs, the treatments required by Kensu and recommended by his physicians and specialists are denied by the Defendants without any medical justification.

32.     In many instances, other prisoners within the MDOC are provided the very accommodations for which Kensu is denied.  For example, Kensu has been denied access to over-the-counter Excedrin despite Excedrin being in common use by prisoners in the MDOC.

33.     Despite a record and medical history replete with laboratory tests and physician recommendations supporting and documenting these serious medical needs, Defendants engage in a policy, plan, or practice to deprive Kensu of treatment for his serious medical needs.

34.    This policy, plan, or practice to deny Kensu treatment for his serious medical needs is not for any medical purpose and is done by Defendants in retaliation against Kensu for his protected conduct of engaging in litigation.

35.    Despite Kensu's continued pleas, filed grievances, and lawsuits requesting Defendants to provide adequate medical care to treat his serious medical needs, Defendants engage in deliberate indifference to Kensu's serious medical needs as they refuse to administer necessary medical care to treat him.

36.    Further, Defendants engaged in a plethora of other retaliatory conduct to punish Kensu for engaging in litigation. This retaliation includes issuing conspiratorial tickets to Kensu to 'justify' placing him in a high security level, denying him access to an appeals process, subjecting him to unlawful property seizures, and other due process violations.

37.    In addition, when Kensu is sent out for medical evaluations, he is subject to harsh conditions that are unnecessary.  For example, many times he is shackled and placed on an MDOC transport vehicle for upwards of 14 hours.  These runs are wasteful and could be reasonably and safely accomplished in far less time.  As such, Kensu at times is reluctant to be subjected to such unnecessary treatment.

38.    Each Defendant was aware of and knew of:

      A. Plaintiff's unique status within the MDOC;

      B. Plaintiff's serious medical needs;

      C. Plaintiff's previous litigation, complaints, and grievances;

      D.  Defendants' continued denials and refusal to treat Plaintiff's serious medical needs; and

E.  Defendants' retaliatory actions against Plaintiff.

39.    Defendants' retaliatory motives are evidenced by their conduct, demonstrated throughout this Complaint by Defendants' clear deliberate indifference to Kensu's serious medical needs.

40.    Each specific retaliatory action taken against Plaintiff ultimately results in a denial of medical care of Plaintiff, whether it be through blocking his access to the grievance process or seizing his medical equipment.  These retaliatory actions result in the wrongful denial of medical treatment for Plaintiff Kensu in deliberate indifference to his serious medical needs.

41.    The exact role of each Defendant in denying Kensu care is known only to those Defendants.  Because each Defendant is aware of Kensu's status and the actions which have been taken concerning his care, each Defendant has ratified and condoned the actions of all other Defendants.

42.    Despite this extensive list of wrongful and harmful conduct by Defendants, Kensu has continued to seek medical care from Defendants only because he is forced to do so, as there is no other available option.

## JURISDICTIONAL ALLEGATIONS AND PARTIES

43.    This Court is conferred jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331 *et. seq*.

44.    Venue is proper in the United States District Court for the Eastern District of Michigan because the majority of the events complained of occurred in this district.

45.    Plaintiff TEMUJIN KENSU (hereinafter "Kensu" or "Plaintiff") was at all

times relevant a prisoner in the custody of the Michigan Department of Corrections.

46.     Kensu was confined at Saginaw Correctional Facility, located at 9625 Pierce Rd., Freeland, MI 48623 during the initial events giving rise to this action.

47.     Kensu has been confined at various facilities within the Michigan Department of Corrections for the entire duration of events that give rise to this action.

48.     Kensu is currently confined at Macomb Correctional Facility (MRF), located at 34625 26 Mile Road, Lenox Township, MI 48048.

## THE DEFENDANTS

49.     Defendant Corizon Health, Inc. ("Corizon") is a Delaware corporation with a principal place of business located at 103 Powell Ct., Brentwood, TN 37027. Corizon may be served at its registered agent, The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, MI 48170. Corizon does business in the Eastern District of the State of Michigan under a contract to provide healthcare services to inmates of the MDOC. Corizon is responsible for providing medical care to prisoners throughout the state. When a prisoner has a medical issue, it is Corizon who will deliver health care services to the prisoner. Corizon's policymakers and/or decision makers include Defendants Papendick, Lacy, and Bomber. Through its policymakers and decision makers, Corizon demonstrated deliberate indifference to Kensu's serious medical needs both through its policies as well as through its inadequate training.

50.     Defendant Rickey Coleman ("Coleman") is the Acting Chief Medical Officer (ACMO) of the Michigan Department of Corrections (MDOC). He was

deliberately indifferent to Kensu's serious medical needs.  He was promoted to ACMO within weeks after having the March 2016 verdict entered against him, perhaps as a reward for demonstrating his ability and willingness to abuse inmates. He is being sued for his personal involvement as well as in his supervisory capacity.

51.    Defendant Patricia Schmidt ("Schmidt") is the Regional Medical Director ("RMD") for Corizon. Defendant Schmidt was deliberately indifferent to Kensu's serious medical needs. She is being sued for her personal involvement as well as in her supervisory capacity.

52.    Defendant Keith Papendick ("Papendick") is the Utilization Management Outpatient Medical Director ("UMO MD") for Corizon. Defendant Papendick is a licensed physician and, at all times relevant to this complaint, was a contractor of the MDOC, an employee of Corizon, a Corizon supervisor, and a Corizon policymaker and decision maker. Papendick is being sued for his personal involvement as well as in his supervisory capacity.

53.    Defendant William Borgerding, M.D. ("Borgerding") was a Michigan resident at all times relevant to this complaint and served as MDOC's Chief Medical Officer, charged with serving as the direct supervisor to MDOC employees and/or contractors at the MDOC. Borgerding is being sued for his personal involvement as well as in his supervisory capacity.

54.    Defendant Minnie Martin ("Martin") is a physician employed by Defendant Corizon who was responsible for treating Kensu. Defendant Martin was deliberately indifferent to Kensu's serious medical needs. Martin is being sued for her personal involvement as well as in her supervisory capacity.

55.     Defendant Ramesh Kilaru ("Kilaru") is a licensed physician and, at all times relevant to this complaint, employed by Corizon. Defendant Kilaru was contracted to work for the MDOC.

56.     Defendant Jeffrey Bomber ("Bomber") is a Michigan resident and, at all relevant to this complaint was a contractor of the MDOC and a supervisor in his capacity as state medical director for Corizon, who also exhibited deliberate indifference to serious medical needs of inmates. At all times relevant to this complaint, he was a contractor of the MDOC, an employee of Corizon, a Corizon supervisor, and a Corizon policymaker and decision maker, and is being sued in his individual and supervisory capacity.

57.     Defendant Robert Lacy ("Lacy") is a Michigan resident and, at all times pertinent to this complaint, a physician who serves as a contractor of the MDOC and a supervisor in his capacity as Regional Medical Director for Corizon. At all times relevant to this complaint, he was a contractor of the MDOC, an employee of Corizon, a Corizon supervisor, and a Corizon policymaker and decision maker, and is being sued in his individual and supervisory capacity.

58.     Defendant Randall Haas ("Haas") was formerly employed by the MDOC to serve as the Warden at Macomb Correctional Facility (MRF). Defendant Haas was the supervisor over all others working at Macomb Correctional Facility and has become personally involved in abusing Kensu as described herein. He is being sued for his personal involvement as well as in his supervisory capacity.

59.     Defendant George Stephenson ("Stephenson") is employed by the MDOC to serve as Deputy at MRF.

60.     Defendant Chris Steece ("Steece") is employed by the MDOC to serve as Deputy at MRF.

61.     Defendant Darrell Steward ("Steward") is employed by the MDOC to serve as Deputy at MRF.

62.     Defendant Lia Gulick ("Gulick") is employed by the MDOC as the Acting Deputy Director. Defendant Lia Gulick was at all pertinent times a Director in the finance department of the MDOC. She began this role in March 2016, only weeks before the verdict was entered. Since that time, she took an active role in retaliating against Kensu for his verdict by, among other things, ensuring that he did not receive adequate medical treatment for his serious medical needs. She is being sued for her personal involvement as well as in her supervisory capacity.

63.     Defendant Lori Kissau ("Kissau") is a Registered Nurse Director employed by the MDOC.  She is being sued for her personal involvement as well as in her supervisory capacity.

64.     Defendant Kim Farris ("Farris") is a physician assistant contractor for MDOC who is employed by Corizon.

65.     Defendant Richard Russell ("Russell") is employed by the MDOC's Office of Legal Affairs as the Hearings Administrator and Grievance Section Manager at MDOC's Central Office in Lansing. He approved the constitutional violations. He denied with a rubber stamp many of Kensu's grievance denials, even when they raised legitimate concerns. He ultimately denied many of the grievances that are at the heart of this litigation. He is being sued in his supervisory capacity as well for his personal involvement.  Claims against Defendant Russell are limited in time to

his involvement in grievances filed by Kensu after October 9, 2017.

66.     Defendant Lisa Adray ("Adray") is a registered nurse employed by the MDOC at MRF.

67.     Defendant Angela Fortescue ("Fortescue") is a Dietitian/Nutritionist employed by the MDOC to serve MRF.

68.     Defendant Patricia Willard ("Willard") is a Dietitian/Nutritionist employed by the MDOC to serve MRF.

69.     Defendant Patrick Warren ("Warren") is employed by the MDOC as a Warden at MRF. He is being sued for his personal involvement as well as in his supervisory capacity.

70.     Defendant Howard Tyree ("Tyree") is a Physician's Assistant employed by Corizon who was contracted to work at the MDOC's Saginaw Correctional Facility (SRF). Before working for Corizon, Defendant Tyree was contracted to the MDOC by way of his employment with Correctional Medical Services, Inc. (CMS) and, later on, Prison Health Services, Inc. (PHS).

71.     Defendant Joshua Buskirk ("Buskirk") is a Physician's Assistant employed by Corizon who was contracted to work at the MDOC's SRF. Before working for Corizon, Defendant Buskirk was contracted to the MDOC by way of his employment with PHS.

72.     Defendant Gina Couturier ("Couturier") is a Physician's Assistant employed by Corizon who was contracted to work at the MDOC's Thumb Correctional Facility (TCF). Before working for Corizon, Defendant Couturier was contracted to the MDOC by way of her employment with PHS.

73.     Defendant Amie Jenkins ("Jenkins") is employed by the MDOC as a Prison Counselor at MRF. She is being sued for her personal involvement as well as in her supervisory capacity.

74.     Defendant Regina Jenkins-Grant ("Jenkins-Grant") is employed by the MDOC as a Resident Unit Manager at MRF. She is being sued for her personal involvement as well as in her supervisory capacity.

75.     Defendant Penny Rodgers ("Rodgers") is employed by the MDOC as a Dietitian at the Gus Harrison Correctional Facility (ARF).

76.     Defendant Eutrilla Taylor ("Taylor") was at all pertinent times employed by the MDOC as Grievance Coordinator at Macomb Correctional Facility. She intentionally and maliciously blocked Kensu's access to the grievance appeal process on numerous occasions, specifically to prevent him from being able to litigate his issues. She explicitly told Kensu that she was doing so to prevent him from filing lawsuits. She is being sued for her personal involvement as well as in her supervisory capacity.  Claims against Defendant Taylor are limited in time to his involvement in grievances filed by Kensu after October 9, 2017.

77.     All of the above-named Defendants were aware of Kensu's serious medical needs.

78.     All of the above Defendants were either directly involved in Kensu's medical care or supervised those involved in Kensu's medical care.

79.     All of the above-named Defendants were deliberately indifferent to Plaintiff's serious medical needs.

80.     In retaliation of Plaintiff's previous litigation and protected conduct, all of

the above-named Defendants conspired with others to ensure Plaintiff continued to suffer.

81.    All of the above-named Defendants collectively conspired to document and alter Kensu's medical file to make it seem as though Kensu never really had any serious medical needs to which Defendants were deliberately indifferent, and as though Kensu's concerns were all being adequately addressed.

82.    Upon information and belief, all individual defendants are Michigan residents and are being sued in their individual and/or supervisory capacities as permitted by law.

83.    When the violations alleged in this complaint occurred, none of the above-named individuals were acting in furtherance of a legitimate governmental function and thus are not entitled to governmental immunity.

84.    The Defendants that are being sued in their supervisory capacities failed to train and supervise their subordinates and, at the very least, implicitly authorized, approved of, or knowingly acquiesced to the unconstitutional conduct of the offending subordinates.

85.    As a result of the Defendants' actions described herein, Kensu has suffered:

    A. Violations of his constitutional rights under the First Amendment of the Constitution of the United States.

    B. Violations of his constitutional rights under the Eighth Amendment of the Constitution of the United States.

    C. Violations of his constitutional rights under the Fourteenth Amendment of the Constitution of the United States.

86.     Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity for the violations of Kensu's constitutional rights and harm caused by their actions/inactions.

## COMPLIANCE WITH PRE-EXHAUSTION REQUIREMENTS

87.     Plaintiff adopts by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

88.     Plaintiff has complied with the pre-exhaustion requirements of the Prison Litigation Reform Act through the appropriate grievance processes of the MDOC for the grievances upon which this litigation is based.

89.     Plaintiff has filed thousands of grievances addressing the issues raised in this matter. Plaintiff has exhausted all administrative remedies.

## GENERAL ALLEGATIONS

90.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

91.     Plaintiff Kensu has a long, documented history of many serious medical needs that affect his daily life.

92.     This history of serious medical needs is documented through years of Plaintiff Kensu's requests for adequate treatment from Defendants.

93.     Despite Plaintiff Kensu's continued pleas, filed grievances, and lawsuits requesting that Defendants provide adequate medical care to treat his serious medical needs, Defendants engage in deliberate indifference to Kensu's serious medical needs in refusing to administer necessary medical care to treat Plaintiff.

94.     The following general list of categories of medical needs and not exhaustive and are meant to provide representative examples.   In general, despite the recommendation of his treating physicians, Kensu is routinely denied access to specialists.   Even when he does get to see a specialist, the findings and recommendations of the specialist are routinely ignored by Defendants either directly or indirectly through supervisory roles.

95.     Kensu has complained of his medical care through grievances and kites. For each Defendant in this matter, Kensu has either directly communicated or has set correspondence to.  It has been suggested that Kensu is known throughout the MDOC as a troublemaker and that there are specific meetings among supervisors concerning his medical care.[1]  As such, all of the Defendants in this matter are fully aware of the facts of Kensu's medical issues.

96.     Each of the Defendants was aware of one or more Kensu's needs concerning the below conditions.  Each Defendant had either direct involvement with Kensu concerning these conditions or supervised those with direct involvement with knowledge of Kensu's serious medical needs.

97.     For each of the conditions described below, Kensu has suffered since at least June 30, 2017, and continues to suffer today.  For many of the conditions, Kensu has been diagnosed after June 30, 2017, but complained of symptoms since before June 30, 2017, to no avail.  For those conditions, Defendants simply stuck their heads in the sand and refused Kensu treatment or evaluation of those symptoms.

### A. Defendants' Deliberate Indifference to Plaintiff's Serious Medical

---

[1] Personal conversation between Kensu's counsel Keith Altman and MDOC's counsel Jim Farrell.

**Needs: Plaintiff Kensu's Benign Prostatic Hypertrophy**

98.    The conduct for which Plaintiff seeks redress occurred after June 30, 2017.

99.    Plaintiff Kensu has suffered, and continues to suffer, from Benign Prostatic Hypertrophy ("BPH"), which has caused him tremendous pain and discomfort for approximately 15 years, including the inability to urinate, micturition, leakage, etc.

100.    For years, Plaintiff Kensu struggled as these medications provided little to no relief for his serious medical needs. The medications either did not work or they had serious adverse effects.

101.    Finally, after a long time, much research, and advocacy for different therapies, Plaintiff Kensu was approved to try the drug Cialis for BPH treatment.

102.    Cialis, which is primarily known for the treatment of erectile dysfunction, has a second approved indication for the treatment of BPH.

103.    After a very long fight for this medication, in September of 2017, the MDOC and Corizon approved the use of Cialis for the next six months for Plaintiff Kensu to treat his BPH.

104.    After receiving the Cialis therapy, almost immediately, Plaintiff Kensu's condition improved dramatically.

105.    With Cialis, Plaintiff Kensu's BPH was more manageable, less painful, and overall produced fewer symptoms compared to any previous therapy. It appeared that the Cialis was working very successfully over the six months.

106.    Medical records confirmed the effectiveness of this therapy, as Plaintiff Kensu's treaters noted a "100% improvement" in his condition.

107.    Despite documented effectiveness of Cialis to treat a condition for which

Plaintiff Kensu for years has sought relief, Defendants engaged in a practice, plan, or policy to deny Plaintiff Kensu access to treatment for this serious medical need.

108.   As the end of Plaintiff Kensu's six-month prescription supply of Cialis approached, Defendants engaged in a retaliatory plan to intentionally let Plaintiff Kensu's prescription for Cialis lapse so that he would experience a gap in treatment for his serious medical needs.

109.   To notify Defendants, and not experience a lapse in treatment, Plaintiff Kensu wrote a medical care request on 3/12/18, which stated, "Tadalafil will expire this month.  Please see that this ACMO medication is reordered and refilled.  Thank you very much."

110.   Despite this timely notice, and a medical record replete with information regarding the necessity of this medication, Defendants Coleman and Schmidt intentionally let this prescription lapse, subjecting him to unnecessary pain and torment as his symptoms returned.

111.   Defendant Schmidt experimented on Kensu by allowing his prescription for Cialis to lapse claiming she wanted to see how Kensu would do with no treatment for his prostate.  Kensu did not consent to this interruption nor was he consulted at any time and there was no medical basis or medical purpose for this lapse in treatment.

112.   Despite testifying that Cialis was working and providing effective treatment for Kensu's serious medical needs,[2] Defendant Schmidt admitted that she let the

---

[2] June TRO Hearing transcript, p. 122.  *Kensu v. Borgerding*.  While the issue was raised in *Kensu v. Borgerding*, the TRO was for the purpose of restoring Kensu's Cialis treatment.  The conduct leading to the denial of Cialis was not a part of *Kensu v. Borgerding*.

prescription lapse "just to make sure that it was working."[3]

113.   Ultimately, Schmidt did prescribe Cialis to no avail.  On approximately 4/12/18, despite copious amounts of evidence relating to the effectiveness and medical need of the treatment of Cialis for Plaintiff Kensu, Corizon Defendant Coleman, in blatant retaliation against Plaintiff Kensu for his litigation against Defendants, and in direct contradiction of the findings, report, recommendation, and request of Kensu's primary care provider Defendant Schmidt, not only blocked the refill of Cialis but wrote a completely false note denying the 'effectiveness' of the Cialis treatment.

114.   Due to the decision to let the prescription lapse, there was a two-week period where Plaintiff Kensu's Cialis therapy was discontinued. Plaintiff Kensu started suffering from the same BPH symptoms that originally made him seek out Cialis treatment. The same symptoms he had fought for years to combat had returned.

### B. Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Orthopedic Needs

115.   The relevant time for the following conduct is after June 30, 2017.

116.   The Court has previously determined that the only orthopedic issue which survived the motion for summary judgment in *Kensu v. Borgerding* is that of Kensu's shoulder.  The Court determined that through June 30, 2017, Kensu had failed to demonstrate deliberate indifference for other orthopedic conditions.  Given that Kensu's shoulder issue is being addressed in *Kensu v. Borgerding*, the following relates to non-shoulder orthopedic issues.  To the extent that the Court

---

[3] *Id.*

may have granted summary judgment concerning some of these orthopedic issues, Kensu continues to not receive care and his medical record is more fully developed.

117.    Since at least June 30, 2017, Kensu has not been seen by an orthopedist to evaluate his serious medical needs. These needs have been well documented in Kensu's medical records. To date, treatment for his orthopedic needs has been unreasonably delayed or denied.

118.    Plaintiff Kensu has serious medical needs that require the immediate attention of an orthopedic specialist. Plaintiff Kensu's need to see an orthopedist stems from several serious medical needs involving back and spinal column diseases and disorders. These include severe, painful and disabling arthritis of the neck with calcification, excruciatingly painful and often disabling spinal degenerative disk disease, disk compression, multiple bulging disks, herniation, stenosis, Schmorl nodes, past fractures, straightening of the lumbar lordosis, spondyloarthropathies, spinal stenosis, sphenoid sinusitis, neuropathy, and radiculopathy.

119.    These severe medical needs are all confirmed by physical exam, CT scans, X-rays, and recent MRI.

120.    The standard of care for treating these issues requires Defendants to supply or administer pain relief, decompressive therapy, a supportive neck brace, a support belt, an orthotic pillow, a cervical pneumatic traction device, chiropractic manipulation, heat and TENS therapy, orthotic shoes, exercise, Excedrin, an orthopedic mattress, and access to proven effective joint compounds.

121.    A neurosurgeon has also recommended that Plaintiff Kensu be referred to a

rheumatologist and an endocrinologist for further examination.

122.    Many of these treatments and therapies have been permitted and given to other prisoners, but denied for the Plaintiff, even where his conditions are much more severe and advanced, the necessary treatments are known to be inexpensive, and where Plaintiff has expressed a willingness to pay for his treatments. Plaintiff is presently denied any care for these injuries and disorders.

123.    Plaintiff Kensu also has suffered from, and continues to suffer from, numerous severe, painful, and often disabling joint tears and damage that include:

> A. Tears of the rotator cuff with impingement in both shoulders; (addressed in Kensu v. Borgerding).
>
> B. X-ray confirmed osteoarthritis and edema with lesions of both knees with MRI confirmed tendon, ligament, bone and cartilage damage to the right knee (and, in the right knee, a 6-year untreated traumatic injury so severe that the leg was initially bleeding internally and greatly swollen from the injury); and
>
> C. X-ray and exam confirmed damage to both ankles with documented and measured impingement in the left ankle caused by wedged, broken bone fragments from a never-treated prison work injury. Both ankles are significantly damaged, arthritic and painful.

124.    Plaintiff Kensu also has serious medical needs concerning his shoulders and knees, including tricompartmental osteoarthritis, significant joint damage, cysts, condylar fractures, lesions, ACL and PCL thinning, among other things.  Kensu's shoulders are not part of the instant lawsuit.

125.    Physicians and experts have recommended various treatments such as surgical repair, which have been covered up and/or denied by the MDOC and Corizon, while also denying all further examination or evaluation.

126.    Further, Plaintiff has never been allowed to see an orthopedic specialist regarding these serious medical needs, never received pain medication since his injury set in, nor was he given any proper, expert evaluation.

127.    Plaintiff Kensu only received an MRI to confirm a severely damaged knee after his 2016 legal victory and his notification to Defendants that he intended to bring another lawsuit.

128.    While Plaintiff Kensu was once provided with pain relief, supportive shoes, gel and arch insoles, ankle sleeves, joint compounds, and had a surgical referral for repair of the left ankle, he is now denied all care and consideration for these painful, disabling disorders.

129.    For years, Plaintiff Kensu has experienced tremendous pain and other issues as a result of these serious medical issues of his knees and shoulders.

130.    These serious medical needs cause several problems for Plaintiff Kensu, including frequent pain and trouble walking.

131.    To diagnose some of these serious medical needs, Kensu received a biopsy of the muscle in his right thigh. Three large samples were taken from the right vastus lateralis muscle in his right thigh.

132.    Despite this long, documented history of problems with his knees and shoulders, Plaintiff Kensu has been continually denied orthopedic consults for his serious medical needs.

133.    This denial of an orthopedic consult is the result of the plan, policy, and practice of Defendants to deny Plaintiff Kensu access to treatment for his serious medical needs.

134.    This denial of consultation is done in retaliation against Plaintiff Kensu for engaging in protected conduct.

135.    Additionally, this retaliation and denial of consultation is done to save Defendants' money, disregarding the serious medical needs of Plaintiff.

136.    On April 9, 2018, HUM Cooper requested that Defendant Schmidt make an appointment with Plaintiff to evaluate his shoulder, knee, and lower back pain.[4]

137.    During deposition testimony, HUM Cooper stated that Plaintiff Kensu needed to see an orthopedist to treat his serious medical needs and that seeing an orthopedist would be the best solution to treat Plaintiff Kensu's serious medical needs concerning his shoulder, knee, and back. HUM Cooper testified that "I wanted his shoulder, knee and back pain addressed."[5]

138.    When asked if Plaintiff Kensu should see an orthopedist, HUM Cooper testified, "I think any time somebody has the same complaint over and over and over and over and over, a specialist would be the best place to determine what course of action should be taken."[6]

139.    During a meeting on April 11, 2018, between HUM Cooper, Defendant Schmidt, and Defendant Corizon employees Defendant Bomber and Defendant Lacy, HUM Cooper again pressed Defendant Schmidt regarding Plaintiff Kensu's

---

[4] Cooper Dep. Vol III at p. 31-32, *Kensu v. Borgerding* (4:16-cv-13505)
[5] Cooper Dep. Vol III at p. 35, *Kensu v. Borgerding* (4:16-cv-13505)
[6] Cooper Dep. Vol III at p. 38, *Kensu v. Borgerding* (4:16-cv-13505)

need for treatment of his shoulder, knees, and back. HUM Cooper asked,

> "but what about the reasons for the initial appointment request. I asked you to address shoulder, knee, low back pain. What about those things. And then to that she responded that he has a knee brace already, that she discussed with him non-drug interventions. She performed some osteopathic manual medicine and called it a day."[7]

140.    On April 12, 2018, Plaintiff Kensu saw HUM Cooper at Corizon health care services and asked if Defendant Schmidt had submitted a request for Plaintiff Kensu to see an orthopedist regarding his shoulder, knee, and back. He was informed that a 407 was not submitted by Defendant Schmidt.[8]

141.    On April 19, 2018, Plaintiff Kensu saw HUM Cooper at Corizon health care services and asked if a 407 had been submitted for his request to see an orthopedist. He was informed there was not.[9]

142.    Plaintiff has submitted countless requests for Defendants to treat his serious medical needs and at minimum to send him to an orthopedist.

143.    HUM Cooper testified that she is not aware of a medical reason as to why Plaintiff Kensu has not been sent to an orthopedist.[10]

144.    HUM Cooper further testified that in the last two years, Plaintiff Kensu has still not seen an orthopedist.[11]

145.    Ultimately, despite countless requests and evidence of Plaintiff Kensu's pain, Defendant Corizon, through Defendant Papendick, denied Plaintiff Kensu's requests for an orthopedic consultation, stating that it was not medically necessary

---

[7] Cooper Dep. Vol III at p. 33, *Kensu v. Borgerding* (4:16-cv-13505)
[8] Cooper Ex. 231 at p. 3, *Kensu v. Borgerding* (4:16-cv-13505)
[9] Cooper Ex. 231 at p. 2, *Kensu v. Borgerding* (4:16-cv-13505)
[10] Cooper Dep. Vol III at p. 33, *Kensu v. Borgerding* (4:16-cv-13505)
[11] Cooper Dep. Vol III at p. 32, *Kensu v. Borgerding* (4:16-cv-13505)

Kensu v. Corizon, et al., Second Amended Complaint, 2:19-cv-10616                34

for Plaintiff Kensu to see an orthopedist.[12]

146.    Despite Plaintiff's pleas, Defendants refuse to discuss the option of seeing an orthopedist or to permit him to schedule any follow-up specialist visits.

147.    Defendants also, without justification, refuse to permit Plaintiff Kensu to take safe, over-the-counter, uncontrolled, non-drug, and well-researched "joint compounds" (such as MSM, Collagen, Glucosamine, Chondroitin, etc.) which are standard supplements used for shoulder conditions such as Plaintiff Kensu's.

148.    Defendants' lack of medical justification for such inhumane conduct constitutes deliberate indifference to Plaintiff Kensu's medical needs and retaliation for Plaintiff Kensu's previous litigation.

### C. Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Rheumatologic and Immunologic Needs

149.    Although Kensu has been complaining of symptoms related to Rheumatologic and Immunologic issues, he was formally diagnosed with various conditions after June 30, 2017.  For years, his complaints were ignored by Defendants.  This lead to a delay in the diagnosis and treatment of Kensu's serious medical needs.

150.    Plaintiff Kensu also has suffered, and continues to suffer from, a progressive muscle loss and wasting disorder known as muscle myopathy, in addition to other immunology issues such as severe combined immune disorder (SCID), hypereosinophilic syndrome, undifferentiated connective tissue disease, and painful, cystic inflammatory lesions potentially resulting from his immune disease

---

[12] Cooper Dep. Vol. I at 132, *Kensu v. Borgerding* (4:16-cv-13505)

(involving masses, rashes, and red, inflamed skin on the chest, arms, groin, shoulders, legs, hips, face, neck, etc.).

151.    Muscle myopathy causes Plaintiff Kensu incredible pain, wasting (cachexia), difficulty eating, swallowing, and breathing, imbalance, vertigo, and other symptoms daily. Plaintiff Kensu also suffers from light, heat, and photosensitivity, in addition to extreme hyperhidrosis.

152.    This disorder is confirmed by physical exam, documented significant muscle and weight loss, muscle biopsies, two electromyelograms ("EMG") and dozens of lab tests.

153.    Despite this documented disorder, Defendants have denied Plaintiff Kensu any care for this condition. Only after recent litigation did Plaintiff Kensu finally receive a protective sunhat.

154.    For his undifferentiated connective tissue disease, Plaintiff takes a toxic chemotherapeutic agent known as Methotrexate and has been denied the option to take natural supplements, plant extracts, and nutritive foods instead of prescription medication.

155.    For his inflammatory lesions, Plaintiff Kensu has been denied a higher dosage of his Retin-A cream by Defendants.  This is done in deliberate indifference to Plaintiff, as the proper, effective dosage he used previously was denied without any rational explanation and with Defendants' full knowledge of the likely consequences of such refusal, including the worsening of the painful effects, itching, and inflamed skin condition suffered by Kensu.

156.    For Plaintiff's muscle myopathy, Defendants stubbornly asked Plaintiff

Kensu to lift weights (a therapy he was asked to do many times before) to mitigate muscle loss, which Plaintiff Kensu had been doing without any evidence of relief from the exercise. Defendants also asked Plaintiff Kensu to continue on Naprosyn, which was taken from Plaintiff Kensu in the course of litigation.

157.    Defendants have failed to provide any medical justification for this inhumane and brutally indifferent conduct.

158.    Defendants' complete denial of Plaintiff's care regarding his muscle wasting disorder and severe immunology needs is done in deliberate indifference to his serious medical needs and in retaliation for Plaintiff's previous litigation.

### D. Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Ear, Nose, Throat, and Breathing Needs

159.    The following allegations concern the time after June 30, 2017.

160.    For years, Plaintiff Kensu has suffered, and continues to suffer from, multiple ear, nose, and throat ("ENT") related disorders, in addition to chronic obstructive pulmonary disease.

161.    These disorders include nasal polyps, which hamper his breathing, eustachian tube defects, significant hearing loss with extreme tinnitus, temporomandibular joint dysfunction ("TMJ") (causing Plaintiff Kensu to grind his teeth, resulting in damaged molars), and lung damage.

162.    These disorders have been confirmed by CT Scans, Visual and Camera Exams, and X-rays.

163.    These disorders have caused Plaintiff Kensu tremendous pain and discomfort, in addition to sleeplessness. For example, the eustachian tube defect

has caused the Plaintiff to suffer from between 75 to 100 excruciatingly painful ear infections (including mastoiditis) during his incarceration.

164.    These disorders have generated numerous recommendations from two of the MDOC's and Corizon's own specialists for certain treatments, such as surgical correction, hearing aids, breathing strips, decongestants and anti-mucolytic agent medications, and a corrective temporomandibular joint ("TMJ") bite-guard.

165.    Plaintiff Kensu currently uses several inhalers daily for the damage resulting from Defendants' deliberate disregard for Plaintiff's lung sensitivity in exposing him to second-hand smoke.

166.    Plaintiff has sought the use of a mechanized aerosol inhaler to treat his condition and has even offered repeatedly to pay for the inhaler himself, but Defendants have refused to permit him such therapy in blatant disregard for his suffering, difficulty breathing, and damage that they caused to his lungs.

167.    The therapies for Plaintiff Kensu's serious medical ENT needs suggested by specialists are the standard of care concerning Plaintiff Kensu's disorders.

168.    Despite the standard of care requiring Defendants to treat Plaintiff Kensu's serious medical ENT needs, the treatments required by Plaintiff and recommended by his physicians and specialists are denied, and any orders canceled or blocked, by the Defendants without any medical justification.

### E. Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Neurological Needs

169.    Defendants were deliberately indifferent to Plaintiff Kensu's several severe medical neurological needs.

170.   Plaintiff Kensu has a brain tumor located in the 4th ventricle region near the base of the brain at the spinal junction.

171.   As a result of his brain tumor, in addition to the previously referenced multiple bulging disks, stenosis and sinusitis of the sphenoid region, Plaintiff Kensu frequently experiences severe, excruciating, and often debilitating migraines.

172.   Plaintiff has had several confirming MRIs and two visits with neurologists, including specialists at the University of Michigan, who instructed him to "continue using Excedrin Migraine."

173.   Excedrin Migraine was the only medication permitted by Defendants to treat his serious medical neurological needs that had been helpful for the migraines, as well as (as he reported to providers) his muscle and joint pain.

174.   Nonetheless, with absolutely no medical justification or explanation, Defendants wrongfully canceled Plaintiff's access to his Excedrin Migraine.

175.   Defendants not only refused to offer him an alternative form of care for either his migraines or his joint disease, but they created a "Special Rule just for Kensu," whereby he was expected, in the middle of crushing migraine attack, to walk the entire length of the enormous prison compound just so he could then "LET HEALTHCARE STAFF 'KNOW' HE HAS A MIGRAINE," without receiving any treatment or relief from the pain upon arrival.

176.   Defendants' actions were cruel, deliberately indifferent to his medical needs, and designed to punish the Plaintiff for his pending litigation.

### F. Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Plaintiff Kensu's Diet Needs

177.     Due to Plaintiff Kensu's extensive serious medical needs, Plaintiff Kensu requires a special medical diet to address many of his health issues. This diet is meant to control and treat Plaintiff Kensu's severe food intolerances and mitigate inflammation and other symptoms due to his serious medical needs.

178.     Defendants use this diet against the Plaintiff in multiple ways.

179.     Plaintiff's rights are denied by the Defendants under the Americans with Disabilities Act in that he has asked for and been denied equal access to foods permitted to other prisoners who do not have medical conditions like his.

180.     As an example, the Defendants offer an enormous variety of food items through prisoner commissaries, visits, special events, holiday meals, and fundraising events. The Defendants know that the Plaintiff cannot purchase items containing milk or wheat and that he must also consume a high protein, low-fat, low-carb and artificial sweetener diet.

181.     Despite this, the Defendants will not allow the Plaintiff to purchase items commensurate with his diet which are offered to other prisoners, and even regularly threaten to cancel his medical diet should he buy "non-approved items."

182.     Thus, while other prisoners can buy protein powder and protein bars, Plaintiff, who requires a high protein diet, cannot, because the only products available are made with milk and wheat.

183.     Plaintiff has repeatedly asked to be allowed to purchase non-milk and non-wheat based alternatives to protein powder and bars (which are available through thousands of legitimate sources, some of which the Plaintiff identified and provided catalogs for, and which were even previously furnished by the MDOC under its

current vendor, Athlete's Needs), but Defendants repeatedly refuse to permit this simple resolution and honor the ADA or the rights of the Plaintiff.

184.     This equally applies to dozens of other food items where a meal, event, or visiting company does not offer a "safe alternative" to the Plaintiff. Despite Plaintiff's needs, he is simply "forced to go without," even where the solution to this matter could not be easier to facilitate. This is part and parcel of the punishment the Defendants knowingly and deliberately subject the Plaintiff (and others with these same conditions or restrictions) to as a "message" to those who seek treatment and honoring of food-related intolerances or conditions.

### G. Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs: Defendant's Deprivation of Plaintiff's Medical Device Property

185.     Because of Plaintiff Kensu's serious medical needs, over the years, Plaintiff Kensu has received several accommodations to treat his various ailments.

186.     These accommodations include, but are not limited to ankle sleeves, corrective shoes, and braces.

187.     Despite his documented serious medical needs, and medical records and recommendations from physicians advocating for the effectiveness and continued use of these medical accommodations, Defendants engaged in a practice, plan, or policy to deprive Plaintiff Kensu of these accommodations in retaliation for his litigation and grievances.

188.     Defendants started this process by taking away medical accommodations that had been assigned to Plaintiff Kensu by physicians as treatment for his serious

medical needs.

189.     Without any tests, evaluations, or examinations, Defendants began to remove the assigned accommodations that physicians determined that Plaintiff Kensu needed to treat his serious medical needs.

190.     On September 16, 2017, Defendants informed Plaintiff Kensu they were removing most of his special medical accommodations, including his ankle sleeves, bone and joint supplements, knee braces, carpal tunnel gloves, gel insoles, prostate supplements, special boots, special diets, and ACE wraps. Defendants additionally attempted to remove Plaintiff Kensu from a cell that had a sink and a toilet in it, which was specifically assigned to Plaintiff Kensu so he could administer treatments and treat his serious medical needs.

191.     Defendants have taken affirmative steps to ensure that Plaintiff will not receive necessary medical care for his serious medical needs.

192.     Defendants have further taken affirmative steps to ensure that medical devices in prisoners' possession, which have been approved by medical professionals, are to be taken away from prisoners.

193.     Defendants conspired to institute completely sham "hearings" and rule against Plaintiff. Defendants condoned and engaged in sham hearings to remove Plaintiff's approved medical items as retaliation.

194.     Defendants ordered that Plaintiff Kensu's approved medical items be confiscated.   When challenged, Defendants manipulated the hearing process to block Kensu's access to the items. Defendants further ordered health care not to release the items to him.

## ADDITIONAL DEFENDANT-SPECIFIC ALLEGATIONS

### A. Allegations Applicable to Each Defendant Listed Below

195.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

196.   Each Defendant's conduct either took place after June 30, 2017 or is related to medical conditions diagnosed after June 30, 2017.

197.   Each Defendant was fully aware of Kensu's serious medical needs.

198.   Each Defendant was aware that Kensu's serious medical needs were not being met.

199.   All of the Defendants named in this Complaint were directly and personally involved with Kensu and his serious medical needs.

200.   Each named Defendant specifically overrode a physician's authorization of accommodations for Kensu's treatment of his serious medical needs.

201.   Each Defendant was obligated to not be deliberately indifferent to Kensu's medical needs.

202.   Each supervisory Defendant, either directly or indirectly, acted with deliberate indifference to Kensu's serious medical needs as discussed above by unreasonably denying or delaying treatment.

203.   The exact relationship between each Defendant concerning Kensu is known only to those Defendants.  Each Defendant ratified and adopted the conduct of each other Defendant in the conduct described in this complaint.

204.    Each named Defendant acted according to a plan or policy to deny Plaintiff Kensu access to treatment for his serious medical needs.

205.    Each named Defendant, in conjunction with each other, acted to approve of the abuse and denial of Plaintiff Kensu's constitutionally protected access to treatment for his serious medical needs.

206.    Defendants acted according to a plan or policy to deny Plaintiff Kensu access to treatment for his serious medical needs.

207.    Defendants acted collectively to approve of the abuse and denial of Plaintiff Kensu's constitutionally protected access to treatment for his serious medical needs.

208.    Defendants' collective decisions to withhold appropriate medical care and treatment from Plaintiff Kensu as described herein with deliberate indifference to Plaintiff's serious medical needs, while Plaintiff was in the MDOC's custody, violated his constitutionally protected rights.

209.    Each named Defendant acted with deliberate indifference to Kensu's serious medical needs, in part, as retaliation for Kensu's verdict, with cruel and evil intentions.

210.    Such retaliation would serve as a deterrent to a person of ordinary firmness from engaging in protected conduct.

211.    The retaliation was motivated at least in part by the protected conduct.

212.    Each named Defendant's conduct is a clear violation of the Eighth Amendment of the Constitution, as each named Defendant routinely demonstrated

deliberate indifference to Plaintiff Kensu's serious medical needs.

213.    Further, each named Defendant's conduct is a clear violation of the First Amendment of the Constitution, as each named Defendant routinely retaliated against Plaintiff for engaging in protected conduct.

214.    Additionally, each named Defendant's conduct is a clear violation of the Fourteenth Amendment of the United States Constitution, as each named Defendant deprived Plaintiff of his life, liberty, or property without due process of law.

215.    In addition to the above allegations common to each Defendant, the following outlines specific additional allegations.

## B. Defendant Corizon's History of Misconduct and Their Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs

216.    At the outset of Defendant Corizon's contract with the MDOC to provide medical care to prisoners housed in the MDOC system, Defendant Corizon engaged in a deceptive and fraudulent pattern, practice, policy, and custom of denying prisoners, including Plaintiff, access to treatment for their serious medical needs.

217.    On March 28, 2018, this widespread Corizon policy was evidenced in deposition testimony in the case of Temujin Kensu v William Borgerding, M.D., et al, 4:16-cv-13505, by former Corizon employee P.A. Marianne McKissick.

218.    P.A. McKissick, the primary treater at MRF for Kensu's serious medical needs from October 2016 until December 2017, gave deposition testimony regarding Corizon's treatment of Plaintiff Kensu.

219.    During questioning regarding Corizon's policy of denying claims for necessary medical treatment, when McKissick was asked, under oath, how often

Corizon would deny claims for consults with specialists, McKissick responded that "90 percent, 99 percent of the time" Corizon would deny the physician's request.

220.   McKissick further testified that all of her recommendations for a consultation with a specialist were based upon her experience as a physician's assistant and the standard of care necessary to properly treat the patient. Corizon denied those recommendations, the recommendations of a physician for treatment necessary to provide adequate healthcare to a patient, 99 percent of the time.

221.   Plaintiff Kensu has collected hundreds, if not thousands, of denials of claims, and thousands of instances in which Defendant Corizon refused to provide adequate care to Kensu and other prisoners.

222.   One such denial includes the wrongful denial, and ultimate restriction, of Plaintiff Kensu's access to Cialis for treatment of his BPH.

223.   Upon the wrongful discontinuation of Plaintiff Kensu's Cialis therapy, Plaintiff Kensu's counsel immediately filed a Temporary Restraining Order ("TRO") seeking the restoration of Cialis.

224.   Once the TRO was filed, miraculously, within a couple of days, Defendants restarted Plaintiff on Cialis. However, now, Defendants decided to make Cialis a restrictive drug, which meant that instead of Plaintiff receiving the drug in monthly allotments in his cell, which he had received for the past six months without any problems, Plaintiff was required to traverse the entire MDOC complex each day to receive his Cialis therapy from the Corizon Nurse's station.

225.   According to hearing testimony from MDOC Chief Medical Officer Defendant Carmen McIntyre, this decision to make Cialis a restricted medication

was made in a meeting between Corizon officials Defendant Bomber and Defendant Schmidt.[13]

226.    Defendant Coleman testified that he did not know of any medical reason why Cialis should be a restricted drug.[14]

227.    Due to Plaintiff Kensu's serious medical needs, including the physical ailments associated with his knees, walking has become tremendously painful for Plaintiff Kensu. The more Plaintiff is forced to walk, the more pain he experiences.

228.    This walk is almost the entire length of the facility compound. Plaintiff Kensu's cell is in the 5 Unit, located in the back of the facility, and the health care where he must retrieve his medication is in the front of the facility.

229.    Despite Kensu's ailments and pain from his biopsy, he was still instructed to make the walk.

230.    Each time Plaintiff Kensu has to walk to the Nurse's station to receive his medication, he incurs tremendous pain. This pain is needless, as there is no medical basis whatsoever for Defendants to restrict Plaintiff Kensu's access to this drug.

231.    This restriction was done in retaliation.

232.    Additionally, Plaintiff Kensu has complained for years about muscle weakness, atrophy, and other muscle-related issues.

233.    HUM Cooper testified that Plaintiff Kensu suffered from these same symptoms for 12 or 18 months.[15]

234.    Plaintiff Kensu continuously sought treatment for these issues, pleading

---

[13] May TRO Hearing, p. 82, *Kensu v. Borgerding* (4:16-cv-13505)
[14] June TRO Hearing, 33, *Kensu v. Borgerding* (4:16-cv-13505)
[15] Cooper Dep. Vol. III at 25, *Kensu v. Borgerding* (4:16-cv-13505)

with Defendant Corizon to provide adequate medical care in the form of treatment or outside consultation with a specialist.

235.    For 12 to 18 months, despite repeatedly complaining about these issues and begging Defendant Corizon for treatment, he was denied care for over a year.

236.    Recently, Plaintiff Kensu was diagnosed with denervation, a diagnosis which could have simply been made 18 months earlier had Defendant Corizon not been deliberately indifferent to Plaintiff Kensu's serious medical needs.

237.    HUM Cooper further stated that this was not consistent with the kind of care a patient should receive.[16]

238.    During the time in which Plaintiff has been incarcerated and in need of treatment for his serious medical needs, Corizon was directly responsible for the treatment of Plaintiff and has at the very least implicitly approved, authorized, or acquiesced in the deliberate indifference to Plaintiff's serious medical needs. Defendant Corizon leads by example, so to speak, by allowing and encouraging their subordinates to be deliberately indifferent to inmates' serious medical needs, such as Plaintiff's, as is demonstrated by numerous verdicts across the country against Corizon finding them both liable for deliberate indifference violations and awarding both compensatory damages as well as punitive damages to plaintiffs. These verdicts, however, did not have the desired effect declared by the legislature's purpose in enacting punitive damages in civil rights cases, since it did not deter them or others from engaging in similar misconduct.

239.    Further, Defendant Corizon could have authorized Plaintiff's required

---

[16] Cooper Dep Vol. III at 26., *Kensu v. Borgerding* (4:16-cv-13505)

surgeries, or many other treatments to address his serious medical needs, but chose not out of deliberate indifference to Plaintiff's serious medical needs. They chose to let Plaintiff suffer. They also actively participated in the mistreatment of Plaintiff by denying Plaintiff required medical treatment.

240.    Defendant Corizon has a policy to deny at least 90% of surgery requests, regardless of medical necessity. This policy is not for any medical purpose. On the contrary, it is only to increase Corizon's profits. Such a policy and/or action and/or inaction by doctors charged with treating patients demonstrates clear deliberate indifference to Plaintiff and directly caused Plaintiff's complained-of injuries.

241.    Defendant Corizon has a pattern, practice, policy, and custom of providing inadequate medical care to prisoners housed in correctional facilities nationwide.

242.    Defendant Corizon, through its employees, officers, and agents, routinely acted according to a plan or policy to deny Plaintiff and other prisoners access to treatment for their serious medical needs.

243.    Defendant Corizon, through its employees, officers, and agents, acted to approve of the abuse and denial of Plaintiff's and other prisoners' constitutionally protected access to treatment for their serious medical needs.

244.    Defendant Corizon's plan or policy to unreasonably deny prisoners access to adequate medical treatment for their serious medical needs is evidenced across a long history of numerous claims, lawsuits, and grievances.

245.    Hundreds, if not thousands, of causes of action have been filed throughout the United States against Corizon.

246.    In these causes of action, the common allegation was Defendant Corizon's

deliberate indifference to the medical needs and care of prisoners detained in the correctional facilities where Corizon was responsible for providing medical and mental health services.

247.    Evidence of Corizon's pattern, practice, policy, and custom of deliberate indifference to the treatment of prisoners is widespread and affects prisoners across the country.

### C. Defendant Rickey Coleman's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs

248.    Defendant Rickey Coleman, as ACMO for Corizon, worked at an administrative level reviewing requests for care. This was done off-site, mainly from Colorado.

249.    Any time Plaintiff or another prisoner would request care from Corizon, it was reviewed by Defendant Coleman from across the country, without ever laying hands on the patient to review their medical needs in person.

250.    To receive care, Plaintiff Kensu would often have to request medical staff to submit a form, known as a 407, to request a procedure not offered at the facility. 407 requests include any off-site visits with a healthcare provider or any non-formulary medications.

251.    Given that Cialis is a non-formulary medication, meaning it was not routinely given to patients housed in the MDOC through a Corizon treatment plan, the Cialis prescription required approval by an Assistant Chief Medical Officer.

252.    Corizon's non-formulary medication and off-site treatment approval process requires the filing out and approval of a 407 form, which was ultimately

passed along by Defendant Corizon to Defendant Coleman for review.

253. Defendant Coleman, working in the administrative level of Corizon as an ACMO, was responsible for reviewing and approving or denying, 407s submitted to Corizon by physicians.

254. Defendant Coleman unreasonably, and unnecessarily, without a medical basis, denied Plaintiff Kensu's access to Cialis.

255. In an affidavit, Coleman claimed, "I found that there was insufficient documentation regarding adverse reactions to the use of standard medications used to treat BPH within the MDOC."[17]

256. Defendant Coleman, in deliberate indifference to Plaintiff's serious medical needs, decided that Plaintiff Kensu would no longer receive Cialis.

257. This decision was made in direct conflict with Plaintiff Kensu's treating physician's recommendation, who testified that it was documented that this medication was working to treat Plaintiff Kensu's serious medical needs.[18]

258. Defendant Coleman made this decision from the across the country in Colorado, without ever having set his hands on Plaintiff Kensu or evaluating his condition in person.

259. Defendant Coleman's decision to discontinue the use of Cialis was made without any reasonable medical basis.

260. Defendant Coleman discontinued Plaintiff Kensu's access to his Cialis medication in direct contravention of Plaintiff Kensu's treating physician's

---

[17] Coleman Aff. at 3, *Kensu v. Borgerding* (4:16-cv-13505)
[18] May TRO Hearing testimony at 52. ,*Kensu v. Borgerding* (4:16-cv-13505)

recommendation that the Cialis be continued.

261.   Defendant Coleman's decision to remove the use of Cialis was done in retaliation against Plaintiff Kensu.

262.   Health Unit Manager ("HUM") Heather Cooper, an MDOC nurse who supervises everyday operations inside the Corizon MDOC health care clinic and coordinates the nurses, physicians, and PAs, testified that Defendant Coleman's decision to discontinue the use of Cialis didn't make sense to her based on her medical knowledge and involvement in recommending and discussing prescription drugs, as "it was documented that (Cialis) had been working for him."[19]

263.   HUM Cooper, testifying regarding the discontinuation of Plaintiff Kensu's Cialis, stated: "there was no medical reasoning for that."[20] Following that question, this exchange took place:

> Q: What not medical reasons came across your mind?
> A: Cost, the fact that it's a -- although I don't know of any times where it's been abused or brought in, that doesn't mean that custody doesn't or that there hasn't been at other facilities so, of course, that, and then I think just that it's Mr. Freeman.
> Q. In other words, that it might be retaliation for this lawsuit?
> A. It could be.[21]

264.   In addition to discontinuing Plaintiff Kensu's Cialis, Defendant Coleman retaliated against Plaintiff Kensu in many other ways.

265.   Defendant Coleman also unreasonably and without cause removed accommodations specifically given to Plaintiff to treat his serious medical needs.

---

[19] May TRO Hearing at 52, 54-55, *Kensu v. Borgerding* (4:16-cv-13505)
[20] Cooper Dep. Vol III at 14, *Kensu v. Borgerding* (4:16-cv-13505)
[21] *Id.*

266.    In an e-mail from Defendant Coleman to P.A. McKissick on September 16, 2017, Defendant Coleman unreasonably instructed P.A. McKissick to remove special medical accommodations given to Plaintiff Kensu to treat his serious medical needs. The email, instructing P.A. McKissick to discontinue these necessary medical items, stated that Defendant Coleman believed that there "doesn't appear to be any medical necessity for these items," despite the long history and medical record clearly showing Plaintiff Kensu's need for these items.

267.    In all, Defendant Coleman unreasonably attempted to remove 16 necessary medical accommodations assigned to Plaintiff Kensu to treat his serious medical needs, including ankle sleeves, bone and joint supplements, knee braces, carpal tunnel gloves, gel insoles, prostate supplements, special boots, special diets, and ACE wraps. Defendant Coleman additionally attempted to remove Plaintiff from a cell that had a sink and a toilet in it, which was specifically assigned to Plaintiff Kensu so he could administer treatments and treat his serious medical needs.

268.    Defendant Coleman decided to remove these accommodations given to Plaintiff Kensu to treat his serious medical needs without reviewing or meeting with Plaintiff Kensu. This decision was made without a medical basis and in retaliation against Plaintiff Kensu.

269.    As to Coleman's unreasonable denial of Plaintiff Kensu's accommodations, HUM Cooper testified that "Dr. Coleman inserted himself in the process and shouldn't have."[22]

270.    When asked if it was inappropriate for the special accommodations to be

---

[22] Cooper Dep. Vol. III at 19. , *Kensu v. Borgerding* (4:16-cv-13505)

discontinued without a medical a reason, HUM Cooper testified that "anything that is a special accommodation, you need to meet with the patient before you discontinue."[23]

271.    HUM Cooper further testified that she "was concerned that he hadn't met with the patient before making this, and this is somebody that is above McKissick telling her to discontinue special accommodations and he hasn't even seen the patient, and that caused me concern."[24]

272.    HUM Cooper later testified that she was concerned that Defendant Coleman's actions were not in the best interests of Plaintiff Kensu's health.[25]

273.    Other evidence of Defendant Coleman's mistreatment of Plaintiff Kensu and deliberate indifference to his serious medical needs is evidenced through an e-mail from Defendant Bomber, Corizon's Chief Medical Director, to Lia Gulick, MDOC's Health Service Administrator. The email states:

> "Dr. Coleman told P.A. McKissick that he would not approve the cane and water bottle request and asked her to review and consider removing several accommodations. Dr. Coleman was not aware of all the specifics regarding this case. Dr. Lacy and P.A. McKissick have been working on the accommodations and Dr. Coleman came in to the middle of this. I am sorry for the confusion. I have instructed Dr. Coleman to remove himself from this process with this inmate at this time. Dr. Lacy will continue to work with P.A. McKissick to clean this up properly. I instructed P.A. McKissick to ignore Dr. Coleman's recommendations."

274.    Defendant Bomber intervening and instructing PA McKissick to ignore Defendant Coleman is strong evidence that Defendant Coleman was unreasonably acting to deny Plaintiff Kensu access to treatment for his serious medical needs.

---

[23] Cooper Dep. Vol. III at 20, *Kensu v. Borgerding* (4:16-cv-13505)
[24] Cooper Dep. Vol. III at 21, *Kensu v. Borgerding* (4:16-cv-13505)
[25] Cooper Dep. Vol. III at 22, *Kensu v. Borgerding* (4:16-cv-13505)

275.    PA McKissick further testified that instances like this caused concern, and "under these circumstances," the high-ups at Corizon may not be looking out for Kensu's best interests concerning his medical care.[26]

276.    Despite instances where Defendant Coleman was advised by other physicians to remove himself from the process of denying care to Plaintiff Kensu, Defendant Coleman continued to exhibit deliberate indifference to Kensu's serious medical needs by engaging in retaliatory conduct to adversely affect Plaintiff.

277.    On or about October 17, 2018, Defendant Coleman denied a request by Dr. Blessman to provide Plaintiff Kensu with CoEnzyme Q10 to treat Plaintiff Kensu's myositis.   Defendant Coleman again unreasonably denied Plaintiff Kensu a physician-approved medical treatment for a serious medical need without any supporting medical basis.

278.    On or about October 25, 2018, Defendant Coleman denied an order by PA McKissick to give Plaintiff Kensu Retin-A (Tretinoin) cream which Plaintiff Kensu used to treat painful cysts.   These cysts affected Plaintiff's daily life until an immune specialist discovered the problem and ordered this medication to be used by Plaintiff. This medication was used and approved for use by Plaintiff's treaters for many years and exhibited great success in treating Plaintiff's cysts.   However, Defendant Coleman unreasonably ignored this serious medical need and denied the use of the cream without a medical basis, claiming there was "no medical need" and gave Plaintiff no alternative treatment.   Today, Plaintiff continues to suffer from documented cysts, masses, and rashes on numerous areas including his groin,

---

[26] Cooper Dep. Vol. III at 24, *Kensu v. Borgerding* (4:16-cv-13505)

shins, arms, abdomen, and face. This condition is worsening despite Defendant Coleman's unsupported claims that Kensu does not medically need this treatment.

279.    On or about November 2, 2018, Defendant Coleman unreasonably denied a medical request to provide Plaintiff Kensu with a new supportive knee brace, claiming that there was "no medical indication for this item." Again, this decision has no supporting medical basis and was done in retaliation against Plaintiff Kensu, as Kensu has previously received from physicians a *permanent* approval for a knee brace. This is clear and blatant retaliation.

280.    On or about January 8, 2018, Defendant Coleman denied Plaintiff Kensu the use of a medically approved neck brace to treat Kensu's serious medical needs. Despite Kensu meeting with specialists who approved the brace, in addition to a heating pad, anti-inflammatories, a back brace, and a TENS unit, Defendant Coleman unreasonably denied Plaintiff Kensu access to medically necessary treatment for his serious medical needs.

281.    Furthermore, following a meeting with a rheumatology specialist, who recommended that Plaintiff Kensu receive medical orthotic shoes and insoles to treat his serious medical needs, Defendant Coleman unreasonably and without a medical basis denied any such accommodation.

282.    This decision was not made with a supporting medical purpose; but rather, this decision was made in blatant retaliation against Plaintiff Kensu.

283.    On December 28, 2018, NP Martino requested for Plaintiff to receive a mattress and neck brace to treat his serious medical needs. Coleman immediately "deferred" the request, claiming the items did not meet MSAC guidelines.

284.    On January 7, 2019, Plaintiff went to the Henry Ford Neurosurgery Clinic

for review of his neck and back MRI.  It was noted that there was a lot of damage,

including "advanced degenerative changes in the spine that will eventually require

surgical intervention."  Further, there were instructions to "not use bed rest for pain

control for more than 3 days."  The report outlined a back treatment plan involving

a heating pad, compressive belt, Excedrin, chiropractic manipulation, exercise,

TENS unit, cervical (neck) pneumatic traction device, orthotic inserts, referral to a

rheumatologist, and referral to endocrine secondary.  The report included a Corizon

Authorization Letter filled out by PA Vera, which notes Plaintiff's serious medical

need of "cervical/lumbar spondylosis," which recommends for treatment a comfort

mattress, heat pat, compressive belt, exercise, spine traction, cervical pneumatic

traction, and orthotic shoes.  NP Martino submitted this for approval to Coleman

on January 23, 2019.

285.    That same day, on January 23, 2019, Defendant Coleman denied all of

these accommodations, claiming there were "no objective findings to support these

items."

### D. Defendant Papendick's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs

286.    Defendant Papendick is Corizon's Utilization Management Outpatient

Medical Director ("UMO MD").  As the UMO MD, Defendant Papendick was

responsible for reviewing 407 requests submitted to him from Corizon employees

regarding medical care for prisoners housed in the MDOC.

287.    PA McKissick testified under oath that dealing with Defendant Papendick

when seeking 407 approvals "is concerning," in that when she would seek approval, Papendick was a "brick wall."

288.    McKissick further testified regarding Papendick's demeanor, stating "If I called him regarding a patient, trying to discuss their care and this is my findings … he was just very -- he wasn't patient. He was very loud. He was very condescending … yelling and being condescending, you know, belittling you, so to speak, but he definitely -- he was not a friendly man to talk to on the phone."

289.    Defendant Papendick was aware of Kensu's serious medical needs.

290.    Without medical justification, Papendick unreasonably delayed or denied Kensu's access to treatment.

291.    Papendicks's refusal to treat Kensu caused delays in diagnosing conditions discussed above that were finally diagnosed after June 30, 2017.   In effect, Papendick stuck his head in the sand and ignored Plaintiff's medical complaints.

### E. Defendant Schmidt's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs

292.    Defendant Schmidt, as Regional Medical Director ("RMD") for Corizon, was assigned to oversee 14 facilities and the medical providers at each of those facilities.

293.    As the RMD for the MRF, Corizon assigned Defendant Schmidt to be Plaintiff Kensu's primary care provider. As Plaintiff Kensu's sole treating physician, Corizon charged Defendant Schmidt to be responsible for all care given to Plaintiff Kensu.

294.    Defendant Schmidt, as RMD, was responsible for submitting paperwork to

Corizon's Chief Medical Officer to ensure that Plaintiff Kensu continued to receive his Cialis medication for treatment of his serious medical needs.

295.    Defendant Schmidt's responsibilities included the duty to ensure that there was no lapse in treatment and the care provided to Plaintiff Kensu, especially for his Cialis medication for treatment of his serious medical needs.

296.    Despite testifying that Cialis was working and providing effective treatment for Kensu's serious medical needs,[27] Defendant Schmidt admitted that she let the prescription lapse "just to make sure that it was working."[28]

297.    Due to Defendant Schmidt's decision to let the prescription lapse, there was a two-week period where Plaintiff Kensu's Cialis therapy was discontinued.

298.    As a result of Defendant Schmidt's conduct, Plaintiff Kensu started suffering from the same BPH symptoms he sought Cialis treatment for. The same symptoms he had fought for years to combat had returned.

299.    As a result of Defendant Schmidt's conduct, Plaintiff Kensu was further subjected to needless pain and torment at the hands of Defendants.

300.    In addition to allowing Plaintiff Kensu's Cialis prescription to lapse, Defendant Schmidt continued to exhibit deliberate indifference to Kensu's serious medical needs by engaging in other retaliatory conduct to adversely affect Plaintiff.

301.    Despite visiting Defendant Schmidt dozens of times and requesting care, Defendant Schmidt has refused to provide any care for a host of serious, painful conditions that Plaintiff suffers from daily.

---

[27] June TRO Hearing, p. 122, *Kensu v. Borgerding* (4:16-cv-13505)
[28] *Id.*

302.    Defendant Schmidt has refused to provide any pain relief, orthopedic treatment, access to specialists, and joint and prosthetic support.  Furthermore, Defendant Schmidt has ignored numerous complaints, visible signs of injury, infection, skin afflictions, joint injuries, test results, and diagnostic findings, in addition to expert-recommended forms of treatment, care, and relief.  Defendant Schmidt has routinely refused to accurately record Plaintiff Kensu's concerns, pain, and level of injury, disability, or damage.

303.    Despite reviewing Plaintiff Kensu's medical record, replete with documentation of Plaintiff Kensu's serious medical needs, Defendant Schmidt has refused to take a single treatment-related action unless ordered by "someone else," claiming she is not "allowed to treat" Kensu. Defendant Schmidt has refused needed tests, referrals, and medications.  Defendant Schmidt has refused to write 407's or file appeals (while lying to Plaintiff and repeatedly promising to do so).

304.    Defendant Schmidt has repeatedly refused to treat Plaintiff Kensu's migraines and held Plaintiff Kensu to an enhanced standard for receiving treatment other patients are not held to.  This is done in retaliation against Plaintiff Kensu in deliberate indifference to his serious medical needs.

305.    Defendant Schmidt has retaliated in multiple forms, including refusing to renew orders for care that had been previously provided, even where the condition at issue has worsened.

306.    Furthermore, Defendant Schmidt has refused to treat in any way, shape, or form Plaintiff's Kensu's muscle disorder.

307.    Defendant Schmidt has lied and claimed that items were "no longer

available" that she knew were still readily available.

308.   Despite Plaintiff Kensu's serious medical needs and documented ailments, Defendant Schmidt continues to violate the accepted standard of care and refuses to administer necessary medical treatment to Plaintiff Kensu.

309.   Despite Plaintiff Kensu's numerous requests, pleas, kites, and grievances seeking medical treatment for his serious medical needs, every physician visit with Defendant Schmidt has been an exercise in futility, as Defendant Schmidt has made it clear that her chosen mission is to cause Plaintiff Kensu pain and suffering while doing nothing to alleviate it.

310.   Despite many documented tests confirming the severity of Plaintiff Kensu's serious medical needs, Defendant Schmidt once claimed she "performed energy healing" on Plaintiff Kensu and "fixed" his severely torn left shoulder and MRI confirmed herniated spine.

311.   Defendant Schmidt's actions and inaction have caused the creation of numerous falsified or deliberately vacant medical records, as her continued deliberate indifference to Plaintiff Kensu's serious medical needs have left a record void of numerous complaints and medical issues.

312.   On November 14, 2018, Plaintiff met with MRF Supervisory Nurse (RN13) Teri Johnson, who reviewed a series of numerous denials of care by Defendant Schmidt, confirmed in writing by Schmidt through email answers to Johnson's inquiries, which display willful, deliberate and even malicious indifference to the Plaintiff's incredible pain and suffering, including:

A. Defendant Schmidt retaliated against the Plaintiff further by once

more refusing to renew the Plaintiff's Excedrin ES order, claiming there was "no evidence of need," where the record indicates that the Plaintiff has successfully used this medication to minimize his migraines and joint pain, and also where the Plaintiff suffers from a muscle disease that causes incredible pain and for which he reported Excedrin helpful. Defendant Schmidt not only placed false information into the Plaintiff's medical record (while failing to document his consistent reports of suffering or effectiveness of treatments), but ignored the standard of care which is the patient's report of what is and is not effective. The "need" for this safe and inexpensive medication is that Plaintiff suffers from a brain tumor, light sensitivity and severe migraines, as well as crippling rheumatic disease and arthritic pain and years-untreated joint injuries. Despite Plaintiff reporting some relief from this medication, and no medical evidence or finding to justify its cancellation, Schmidt refused to renew the prescription.  This was done in retaliation for Plaintiff's grievances and lawsuits.

B.  Defendant Schmidt further retaliated against Plaintiff by denying him medical treatment for his photophobia.  The Plaintiff suffers from documented extreme sun and light sensitivity (known as photophobia) which is magnified by the fact that he takes the chemotherapeutic drug Methotrexate. Defendant Schmidt denied the Plaintiff replacement of his "sun shield" glasses, incredibly "blaming" the facility optometrist.

However, the Plaintiff had just met with the facility optometrist, who clearly explained to Plaintiff that Defendant Schmidt had to write such an order. Schmidt did this deliberately and indifferently to the Plaintiff's long-standing condition, knowing that prisoners can only obtain such eyewear through medical services since the MDOC changed its property policies in the 1990s.

C. Defendant Schmidt blatantly lied in denying Plaintiff access to his TENS unit, claiming "there were no TENS Units in the MDOC. However, Schmidt knew, per Kensu, that Kensu had just watched prisoners picking up the replacement pads for their TENS Units. Nonetheless, Defendant Schmidt created this false record as if it were justification for maliciously and indifferently denying the Plaintiff an effective avenue of treatment and relief for both his bulging and herniated spinal disks and damage, especially where TENS therapy is an accepted, standard treatment for muscle diseases the Plaintiff has.

D. Even where Plaintiff has an order from a Rheumatic Disease Specialist for special footwear (which is identified even in Current Medical Diagnosis and Treatment (CDMT 2018)) used by the MDOC as the standard treatment for ankle, knee, hip, back, neck, radiculopathy, and neuropathy related disorders, ALL of which the Plaintiff suffers from, Defendant Schmidt maliciously and in contradiction to past and present orders refused to write a simple 407 request to get the Plaintiff the shoes and inserts he requires. Defendants' actions were willful and

were intended to punish, harm and continue the suffering of the Plaintiff and had no medical justification whatsoever.

E. Nurse Johnson inquired about the Plaintiff receiving a proper neck traction device for the painful, bulging neck disks he suffers from, and even relayed photos of a medically approved item he was willing to pay for himself. Defendant Schmidt refused to take any action to care for the Plaintiff's neck or back damage.

313. Defendant Schmidt's inhumane, purposeful, indifferent, cruel, and retaliatory actions as a whole have endangered Plaintiff Kensu's mental and physical health and safety.

**F. Defendant Borgerding's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs**

314. Defendant Borgerding engaged in years of retaliatory conduct against Plaintiff Kensu, including denying items and treatment to treat his serious medical needs, such as denying him a knee brace, lying in emails about his conditions, and denying multiple forms of care that he provided to Kensu previously as his physician at Kinross from 2001 to 2003, including the provision of vitamins, supplements, special shoes, inserts, ankle sleeves, pain relief, therapy, etc.

315. Borgerding further denied care to Plaintiff for many of his serious medical needs, including treatment to his ankles, back, shoulders, neck, bowel, etc.

316. Further, both HUM Cooper and PA McKissick continuously identified Borgerding as one of the "primary deniers" of almost every aspect of Plaintiff's care, ranging from the denial of orthopedic consultations to pain medications,

support items for Plaintiff's damaged joints, the illegally seized items Defendant Haas was involved in, the denial of supplements, and many other denials.

317.    There was never any "disagreement about treatment" from Defendant Borgerding, who has provided Plaintiff none and blocked others from doing so. Defendant Borgerding blocked Plaintiff from pursuing care at his own expense.

318.    Defendant Borgerding did not provide any medical attention for any of Plaintiff's serious medical needs relating to his neck, back, knees, ankles, prostate, hearing loss, tinnitus, incredible pain, disability, allergies, or diet issues. Further, Defendant Borgerding worked to prevent Plaintiff from receiving medical attention from other treaters, even where he refused to treat Plaintiff.

319.    Both HUM Cooper and PA McKissick repeatedly mentioned Defendant Borgerding was in contact with others such as Defendant Corizon, Defendant Gulick, and Defendant Kissau, among others, in a conspiracy to deprive Plaintiff of care.   HUM Cooper and PA McKissick specifically described an ongoing conspiracy which became so intense that Defendants ordered staff to "not put things about Kensu in writing because his lawyers would wind up getting them."

320.    This practice ensured that no proper, honest record documenting Plaintiff's medical issues, complaints and condition would be generated, seriously placing him at grave risk.

### G. Defendant Martin's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs

321.    Defendant Minnie Martin ("Martin") is a physician employed by Defendant Corizon who was responsible for treating Plaintiff Kensu.

322.   As detailed throughout many of Plaintiff's grievances against her, Defendant Martin subjected Plaintiff to grossly inhumane medical misconduct and deliberate indifference, refusing to treat a single one of his serious and painful medical conditions, including his bowel disease, as well as his incredible back, joint and neck pain, all now confirmed via MRI as being caused by serious, easily discernible medical conditions and injuries.

323.   Defendant Martin's deliberate indifference resulted in numerous "medical runs" to hospitals and eventual emergency surgery, such as one such instance costing the Plaintiff several feet of his colon and resulting in months of hospitalization and a permanent, disabling condition (post-surgical ileus with bowel evacuation disorders).

324.   Defendant Martin also repeatedly retaliated against the Plaintiff by canceling care he was already receiving from other expert providers to treat his serious medical needs, including the cancellation of his medical diet, embolism support stockings, Juven nutritional supplementation, and all pain relief to include post-surgical pain medications.

325.   There was no medical basis for these cancellations.  This was done in retaliation against Plaintiff Kensu as a result of him engaging in protected conduct.

326.   Plaintiff's medical file is replete with numerous "meetings" with Defendant Martin.  Rather than discuss an adequate treatment plan for his serious medical needs, Plaintiff's requests were refused and met with comments mocking, belittling, and degrading Plaintiff.

327.   Martin's retaliatory cancellations of the minimal care he was receiving was

done to him to punish him for his many grievances against her.

328.    Testing, diagnostics, biopsies, and the aforementioned emergency surgery has confirmed the serious medical needs that Plaintiff has suffered from.  The very same medical needs that Plaintiff sought treatment for from Martin.  Despite his continued requests, Defendant Martin refused to provide any adequate treatment.

329.    Martin not only refused to consider or treat Plaintiff's serious medical needs but often mocked or claimed Plaintiff "did not suffer from" any of them.

330.    Plaintiff sought treatment for immense abdominal pain again from Defendant Martin.  Defendant Martin claimed Plaintiff was fine and his illness "did not exist." Defendant Martin offered no treatment or relief for Plaintiff's serious medical need.  Following Martin's refusal to provide care, Plaintiff checked himself into punitive segregation and laid immobile in agony for two days.  Finally, Plaintiff was examined on the orders of administrative staff.  An EKG revealed cardiac abnormalities, and Plaintiff he was rushed to a local hospital.  Subsequent CT Scan results confirmed an obstructed, twisted bowel and the Plaintiff was taken to Allegiance Hospital where they removed nearly two feet of his colon.

### H. Defendant Farris's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

331.    Defendant Farris is the Physician's Assistant charged by Corizon to administer care to Plaintiff Kensu.  Despite Plaintiff Kensu's serious medical needs, Defendant Farris refused to treat any of Plaintiff's serious medical needs for an extended time.

332.    On multiple occasions, Defendant Farris ignored Plaintiff's requests for

treatment for his serious medical needs and refused to discuss any of his conditions. Defendant Farris told Plaintiff Kensu she would not do anything about his neck and back issues, and additionally refused even basic pain management, such as anti-inflammatory medications, even after being presented with MRI evidence confirming Plaintiff was suffering from severe medical conditions requiring pain management.

333.    When denying Plaintiff care, Defendant Farris told Plaintiff Kensu that "Dr. (Defendant) Borgerding and I discussed your case and we are not going to be treating any of these things."

334.    Following Plaintiff Kensu grieving the issues against Defendant Farris, Plaintiff won relief through the HUM (Cooper) and his case was transferred back to PA McKissick.  PA McKissick told Plaintiff she had been repeatedly insulted and degraded by Farris for McKissick's role in providing a better level of care for the Plaintiff.

335.    While Defendant Farris mocked Plaintiff and refused to provide treatment or care, falsely alleging Plaintiff did not suffer from any of his serious medical needs, PA McKissick ordered Plaintiff CT Scans and MRI's, as well as the ENT visits, which confirmed these disorders that Defendant Farris refused to acknowledge and treat.

336.    At one point, Defendant Farris claimed (and wrongfully diagnosed) that Plaintiff suffered from painful Rheumatoid Arthritis.  Upon review of Plaintiff's MRI, which showed extensive damage and a herniated disk in his back, Defendant Farris still refused to provide him with either ANY care or ANY form of pain relief.

337.    Furthermore, Defendant Farris attempted to diminish Plaintiff's muscle disease.  Defendant Farris refused to provide any care whatsoever, and upon challenge, stated that she had "forgot" that Plaintiff had lost over 30lbs from the same disease.  Yet, she still refused to provide any treatment or care.

338.    In the rare instances that Plaintiff did receive treatment for his serious medical needs, Defendant Farris has told Plaintiff Kensu "that's bullshit," in addition to challenging the care, stating "ain't no way he should have got all that."

339.    On multiple occasions, when Plaintiff Kensu had scheduled callouts with Defendant Farris to discuss and treat his serious medical needs, but Defendant Farris refused to treat, discuss, or provide care to Plaintiff.

340.    Defendant Farris's actions and inaction has caused the creation of numerous falsified or deliberately vacant medical records, as her continued deliberate indifference to Plaintiff Kensu's serious medical needs have left a record void of numerous complaints and medical issues.

341.    Farris's inhumane, purposeful, indifferent, cruel, and retaliatory actions as a whole have endangered Plaintiff's mental and physical health and safety.

### I. Defendant Jenkins's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

342.    Defendant Jenkins has engaged in openly hostile conduct against Plaintiff Kensu in blatant retaliation for engaging in the protected conduct of filing lawsuits.

343.    When Plaintiff went to take his chemo treatment, Defendant Jenkins worked for hours to try to justify a completely false ticket claiming that Plaintiff was "out of place." Plaintiff grieved this violation but was still excluded from elections to be

a block representative in the prison because the ticket made Plaintiff ineligible for candidacy.

344.    Defendant Jenkins's conduct was clear retaliation for Plaintiff's litigation.

345.    Plaintiff Kensu has been allowed to keep a cardboard banker's box in his cell to hold all of his legal paperwork.  This box contains important paperwork and was given to Plaintiff Kensu to maintain safe control of his protected materials. Plaintiff Kensu was allowed to keep this cardboard box in his cell without issue.

346.    Once Defendant Jenkins found out Plaintiff Kensu had this box in his cell, she engaged in the retaliatory action of removing the box and throwing his legal paperwork around his cell, scattering the important legal documents.

347.    When Plaintiff Kensu returned to his cell to find his legal documents scattered around the room, he challenged Defendant Jenkins and inquired why she would confiscate a box that he had been previously approved to keep.

348.    Defendant Jenkins ignored Plaintiff's request to keep the box to keep his legal documents safe and wrote Plaintiff a misconduct ticket. Jenkins then turned off Plaintiff's phone, denying him access to his attorneys.

349.    Jenkins further worked to remove Plaintiff from all of his callouts.

350.    These hostile measures taken against Kensu by Defendant Jenkins were shocking and extraordinary.

351.    Plaintiff spoke with other prisoners to discuss Defendant Jenkins and asked if she had taken similar punishment actions against them for similar conduct.

352.    Kensu identified and spoke to dozens of other prisoners who were not punished this way by Jenkins, some who even had very serious offenses such as

violence, theft, and drugs.

353.    Defendant Jenkins did not take similar punishment actions against any other prisoners.  This punishment was given to Plaintiff Kensu in retaliation for engaging in protected conduct.

354.    In further retaliation, Defendant Jenkins did not restore Plaintiff's callouts following the 3-day punishment period for his "misconduct."

355.    Plaintiff Kensu continues to receive unwarranted punishments as a result of Defendant Jenkins's actions.

356.    At some time in September of 2018, Jenkins, in blatant retaliation against Plaintiff, attempted to set up Plaintiff with a phony "out of place" ticket.

357.    Around that time, Plaintiff went to healthcare to receive medicine. Defendant Jenkins and an officer worked for hours to try to justify giving Kensu a completely faked ticket, claiming he was "out of place."

358.    Defendant Warren claimed he was investigating this incident.  He did no such thing.

359.    The ticket was eventually thrown out because Jenkins and the ticketing officer lied so blatantly.

360.    Plaintiff grieved this incident. Plaintiff Kensu's grievance was blocked.

361.    Jenkins did this to punish Plaintiff and also block him from the upcoming Block Representative election, which Jenkins told Plaintiff he was "not running for."  A ticket would block Plaintiff from this position.

362.    Jenkins was never punished for her lies and retaliation.

363.    On or about October 26, 2018, Defendant Jenkins wrongfully denied

Plaintiff Kensu a prison visit, claiming the visitor was "not on (his) list."

364.    Defendant Jenkins failed to follow the policy of informing Plaintiff when they received his visitor's application to visit.  Instead, Defendant Jenkins lied to Plaintiff, claiming she did not know what he was talking about.  When further challenged, Defendant Jenkins claimed she had never received the form.

365.    Coincidentally, the day after this challenge, Plaintiff Kensu received a copy of the rejection of the visitor's application form.  The same form that Defendant Jenkins claimed she never received.

366.    Later, Defendant Jenkins denied Plaintiff's visitor for a second, wholly different and fraudulent reason (after having approved the Plaintiff's submitted visitor's list and never alleging any errors), and later lied about it. Defendant Warren did nothing to intervene in this issue.

367.    Further, Defendant RUM Jenkins-Grant conspired with Defendant PC Jenkins to penalize the Plaintiff for a complaint about the PC entering Plaintiff's cell, going into his locker, taking his legal materials, rifling through them, dumping them on the floor and taking the storage box that Jenkins and Jenkins-Grant (and all other staff) knew the Plaintiff had (having prior staff permission to receive this file box on an attorney visit) and further violated Plaintiff's rights by "suggesting" to her subordinate PC Jenkins (no relation per MDOC) that she "write Kensu a ticket" when he protested these abuses and then asked for a receipt (required by MDOC policy) for the improperly seized legal materials box.

368.    RUM Jenkins-Grant, as the PC's direct supervisor, not only condoned but encouraged all of Defendant PC Jenkins's misconduct against the Plaintiff.

Defendant RUM Jenkins-Grant then illegally conducted a sham "hearing" on this box ticket she "suggested" be written in violation of MDOC policy and the Plaintiff's rights, further lying in the body of the finding by attributing completely fabricated statements to Lt. Neuberger about the matter.

369.   Defendant Warden Warren admitted in writing that though Neuberger told MRF Administrative Assistant Mona Golson that Jenkins had lied, he would not speak with the Lt. about the matter though seeing him almost every day.

370.   Both Jenkins and Jenkins-Grant admitted to Plaintiff of their personal dislike and disdain for him after Plaintiff personally met with and "kited" (wrote) Defendant Warden Warren, Deputy Stephenson and Assistant Deputy Greason about these staff members regarding the continued harassment, cell intrusions, verbal abuse, due process, telephone, legal materials, activity and visiting related violations as well as Defendant PC Jenkins repeated requests and attempts to retaliatory transfer the Plaintiff, these Supervisory Defendants refused to take any corrective action against either or both Defendant Jenkins or to see the matters in question addressed and properly corrected and the abuses and harassment halted. Such dereliction only inspired Jenkins and Jenkins-Grant to further harass and abuse the Plaintiff which they did.

371.   These instances are examples of the petty attacks in which Defendant Jenkins has attempted to mess with Plaintiff Kensu's life in pure retaliation for engaging in protected conduct.

### J. Defendant Taylor's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

372.    Defendant Taylor wrongfully and continually denied Plaintiff Kensu the ability to engage in conduct protected by the Constitution or by statute.  Defendant Taylor took these adverse actions against the Plaintiff in retaliation due to Plaintiff's filing of lawsuits.

373.    Defendant Taylor, on dozens of occasions, refused to properly process Kensu's serious medical claims.

374.    Defendant Taylor additionally denied Plaintiff Kensu any review of his serious medical conditions, resulting in further pain and suffering.

375.    Defendant Taylor further engaged in wrongful retaliatory conduct by falsifying records and denying claims without a logical basis.

376.    One such action is that Defendant Taylor routinely denies Plaintiff's grievances as "late," despite Plaintiff Kensu filing the grievance on the same day as the violation.

377.    Further, Plaintiff Kensu makes a point to type grievances very clearly, giving extremely detailed and extensive explanations outlining the wrongful or challenged conduct.   Despite this, Defendant Taylor routinely denies such grievances as "vague," while simultaneously refusing to speak with Plaintiff to provide an explanation or an opportunity to cure such vagueness.

378.    Additionally, Defendant Taylor, in denying the grievance, would simply write that Plaintiff had "failed to try and resolve the matter," despite extensive evidence outlined in the grievance itself explaining that Plaintiff had gone to often desperate lengths well beyond any fair expectation of a person trying to seek resolution.  This includes writing kites, letters, emails, meeting with the persons

involved, having outside parties contact the grieved parties or their supervisors, or Plaintiff himself contacting the grieved parties or supervisors.

379.   At a meeting with Defendant Warren, upon reviewing four fraudulently-reasoned denials, Warren told Kensu, "well what else did she expect you to do?"

380.   Warren then told Kensu Defendant Russell had instructed Warren to "go ahead and reject them anyway because he is going to use them for his lawsuit now."

381.   Warren also told Kensu that Warren told Russell "Kensu is right; she (Taylor) didn't even give him a chance to reason or fix whatever she was claiming is wrong with them. We've always done that."

382.   Russell then told Warren "Don't do that; just reject them."

383.   Defendants took this illegal and conspiratorial posture thinking this would somehow shield them or healthcare staff from liability and accountability, regardless of the incredible threat these denials caused Plaintiff in prolonging his pain and suffering.

384.   Plaintiff reported this constant misconduct to Defendants Haas, Russell and Warren.  Defendants condoned and supported this misconduct.

385.   Defendant Taylor's actions have harmed the Plaintiff in many ways.  By denying Plaintiff Kensu's grievances, Defendant Taylor does not allow prisoners to resolve denials of medical care. Defendant Taylor's actions effectively denied Plaintiff a right to a grievance process, obstructing his access and interfering with his litigation.

386.   Defendant Taylor's actions were willful and deliberate obstruction, as Defendant Taylor knew that denying Plaintiff access to health care review and

meetings would not only deny him access to care, but would impede any litigation.

387.    Further, Defendant Taylor engaged in these actions at the order of her superiors, as she had been "told" and "trained" to do this.

388.    This process was obstructed by Defendant Taylor to retaliate against him for engaging in protected conduct.

389.    Defendant Taylor's decision to deny Plaintiff access to the grievance process, and deny him access to the Courts, violated his constitutionally protected rights.

### K. Defendant Warren's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

390.    Upon information and belief, Defendant Warren knew of repeated constitutional violations by Defendants against Plaintiff Kensu.

391.    At all times relevant to this complaint, Defendant Warren, as Warden of the MDOC, was responsible for the supervision, discipline, and control of his subordinates.

392.    Defendant Warren, the supervisor of the prison, owed Plaintiff Kensu a duty to act and not be deliberately indifferent to his serious medical needs. His neglect in ignoring Kensu's repeated requests for medical treatment, despite knowledge of Kensu's serious medical needs and the unreasonable denial of treatment made aware to him through the filing of thousands of kites and grievances, violated Kensu's constitutionally protected right to medical treatment.

393.    While initially agreeing to take proper action and ensure that Plaintiff Kensu received the necessary medical treatment he required, Defendant Warren

wrongfully rejected numerous grievances filed by Plaintiff, falsely claiming Plaintiff was "late." Despite informing Defendant Warren multiple times that Defendant Taylor was blocking his access to the Court, falsifying records and refusing to provide Plaintiff with proper Step Two forms for weeks, Defendant Warren ignored the evidence and wrongfully acquiesced and participated in the unconstitutional denial of care.

394.    Defendant Warren, in refusing to allow Plaintiff Kensu to properly process grievances, ensured that Kensu's requests for care would get denied with no review, consideration, answer, or resolution.

395.    Defendant Warren knew of Defendant Taylor's misconduct and reviewed Defendant Taylor's falsifications and denial of claims for false reasons.

396.    Defendant Warren implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate or directly participated.

397.    Defendant Warren was a warden and supervisor acting under the color of law in his actions and omissions and at least implicitly approved, authorized or acquiesced in the unconstitutional conduct exhibited by his subordinate defendants named herein. All of the individually named Defendants were acting under the direct supervision of Defendant Warren. Defendant Warren established policies for his subordinates to follow which permitted the Defendants to carry out the constitutional violations described herein.

### L. Defendant Haas's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

398.    Upon information and belief, Defendant Haas knew of repeated

constitutional violations by Defendants against Plaintiff Kensu.

399.   At all times relevant, Defendant Haas, as Warden of the MDOC, was responsible for the supervision, discipline, and control of his subordinates.

400.   Defendant Haas, the supervisor of the prison, owed Plaintiff Kensu a duty to act and not be deliberately indifferent to his serious medical needs. His neglect in ignoring Kensu's repeated requests for medical treatment, despite knowledge of Kensu's serious medical needs and the unreasonable denial of treatment made aware to him through the filing of thousands of kites and grievances, violated Kensu's constitutionally protected right to medical treatment.

401.   Plaintiff Kensu discussed his medical issues, the non-treatment of his medical issues, and Defendant Taylor's continued interference with the grievance process with Defendant Haas.  Defendant Haas authorized Defendant Taylor to engage in retaliation, including a phony "grievance restriction" for four valid medical grievances.  Defendant Haas approved the retaliation in writing.

402.   Further, Defendant Haas ordered medical staff and his own Inspector (Leduc) to seize the medical items Plaintiff was approved to receive, including Kensu's joint and prostate supplements, back belt, insoles, and other items.

403.   Defendant Haas ordered Defendant Jenkins to conduct completely sham "hearings" and rule against Plaintiff Kensu. Defendant Haas then later ordered Defendant Jenkins to "re-do" the phony hearings TWICE, changing the record in the matter each time. Defendant Jenkins, abiding by Defendant Haas's orders, willingly engaged in such serious, due process violations, and mocked Plaintiff while doing so, referencing that Plaintiff will sue Defendants as has been done in

the past to protest the violations during such hearings.

404.    Defendant Haas condoned and engaged in sham hearings to remove Plaintiff's approved medical items.

405.    Defendant Haas, through Defendants Stephenson and Steward, ordered that Plaintiff Kensu's approved medical items be confiscated.   When challenged, Defendants manipulated the hearing process to block Kensu's access to the items. Defendants further ordered health care not to release the items to him.

406.    Defendant Haas permitted his staff to harass and interfere with Plaintiff Kensu's legal visits and refused to let Plaintiff release funds to his attorneys.

407.    PA McKissick also identified Defendant Haas as being "mostly responsible for blocking (Kensu's) access to the medical items," telling her "not to approve anything else."

408.    Defendant Haas also blocked Plaintiff from receiving the actual book that he wrote which expresses his religious belief regarding Natural Care.

409.    Defendant Haas engaged in these actions in retaliation against Plaintiff Kensu for engaging in protected conduct.

## M. Defendant Gulick's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

410.    Defendant Lia Gulick has taken an active role in retaliating against Kensu for his verdict by, among other things, ensuring that he does not receive adequate medical treatment for his serious medical needs.

411.    Defendants Gulick and Borgerding had complete control and oversight over Plaintiff's care and all of the denials of care that Plaintiff Kensu was subjected to.

412.    HUM Cooper sent Defendants Gulick and Borgerding DOZENS of memos and emails on the subject of Plaintiff Kensu's care, including constantly asking them to provide specific answers to questions about his serious medical needs, requests to pay for his care, and requests to outline exactly what type of care Plaintiff would be permitted to obtain or pay for.    Defendants Gulick and Borgerding routinely refused to provide any clear answers.

413.    Defendant Gulick further condoned the seizure of medical items Plaintiff Kensu already had been approved for, such as the cancellation of his Naprosyn order, his hot water bottle, in addition to further seizures.

414.    In addition, Defendant Gulick advised her subordinates not to communicate concerning Kensu in writing so that there was no paper trail of these communications.  Such a directive had no legitimate medical purpose.

### N. Defendant Russell's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

415.    Defendant Russell, employed by the MDOC's Office of Legal Affairs as the Hearings Administrator and Grievance Section Manager, engaged in a policy, plan, or practice of wrongfully denying all of Plaintiff's grievances.

416.    These denials had no legitimate purpose.  Rather, Defendant Russell denied Plaintiff's grievances in retaliation for Plaintiff engaging in protected conduct.

417.    Defendant Russell commanded his subordinates to deny Plaintiff's grievances. This was done to block Kensu's ability to engage in protected conduct.

418.    When Plaintiff Kensu challenged the denials and questioned Defendant Warren about the denials, Defendant Warren informed Plaintiff Kensu that they

were denied at the direction "from Russell" or "Lansing."

### O. Defendant Willard's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

419.   Defendant Willard is currently the Chief Dietician for the MDOC.

420.   Willard had direct involvement with Kensu and was in part responsible for his dietary needs.

421.   Willard knew of Kensu's serious medical needs and was aware of his dietary requirements.  Furthermore, Willard was aware that Kensu had been prescribed specific diets by his treaters.

422.   Despite orders for specific dietary needs, Willard conspired and acted with other Defendants to deny Kensu his necessary and prescribed diet.

423.   Through a consistent campaign in violation of Kensu's rights and with deliberate indifference to Kensu's serious medical needs, Willard has blocked Kensu from receiving a diet adequate to sustain normal health as modified by Kensu's healthcare professionals.

### P. Defendant Kilaru's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

424.   Defendant Kilaru was a Physician employed by Corizon.

425.   Before June 30, 3017, Kilaru treated Kensu and was aware of Kensu's serious medical needs for conditions that were diagnosed after June 30, 2017.

426.   Despite being fully aware of Kensu's medical complaints, Kilaru denied or unreasonably delayed the treatment of Kensu's serious medical needs.

427.   Kilaru's refusal to treat Kensu caused delays in diagnosing conditions

discussed above that were finally diagnosed after June 30, 2017.  In effect, Kilaru stuck his head in the sand and ignored Plaintiff's medical complaints.

428.   Plaintiff did not previously bring suit against Kilaru for conditions diagnosed after June 30, 2017, because he had not yet been diagnosed with those conditions at the time of previous lawsuits.

429.

### Q. Defendant Bomber's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

430.   Defendant Bomber was the state medical director for Corizon.  In this capacity, Bomber was the senior official of Corizon in Michigan.

431.   In his role with Corizon, Bomber had supervisory authority over all Corizon employees in Michigan.

432.   After June 30, 2017, Dr. Bomber was fully aware of Kensu's serious medical needs.

433.   Dr. Bomber was fully aware of Kensu's complaints about his serious medical needs not being met.

434.   Dr. Bomber himself denied or unreasonably delayed treatment for Kensu's serious medical needs.

435.   Dr. Bomber also allowed Corizon and his subordinates to deny or unreasonably delay treatment for Kensu's serious medical needs.

### R. Defendant Lacy's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

436.   Defendant Lacy was the regional medical director for Corizon.  In this

capacity, Lacy managed Corizon's activities and employees at the Macomb Correctional Facility.

437.    In his role with Corizon, Lacy had supervisory authority over all Corizon employees at the Macomb Correctional Facility.

438.    After June 30, 2017, Dr. Lacy was fully aware of Kensu's serious medical needs.

439.    Dr. Lacy was fully aware of Kensu's complaints about his serious medical needs not being met.

440.    Dr. Lacy himself denied or unreasonably delayed treatment for Kensu's serious medical needs.

441.    Dr. Lacy also allowed Corizon and his subordinates to deny or unreasonably delay treatment for Kensu's serious medical needs.

### S. Defendant Stephenson's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

442.    Defendant Stephenson is a deputy at the Macomb Correctional Facility.

443.    Stephenson was aware of Kensu's serious medical conditions.

444.    Stephenson, in conjunction with Defendants Haas and Steward, confiscated medical items which had been approved by Kensu's medical providers.

445.    Stephenson manipulated the hearing process preventing Kensu from access to these approved medical items.

446.    By confiscating Kensu's medical equipment with knowledge of Kensu's serious medical needs, Stephenson was deliberately indifferent to Kensu's medical

care.

### T. Defendant Steece's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

447.     In the summer of 2018, Steece, in conjunction with Defendant Fortescue, fabricated a PREA complaint claiming that Kensu was being abused by HUM Heather Cooper.  This complaint was filed by Defendant Fortescue on Kensu's behalf and without his knowledge or consent.

448.     There was no basis for the PREA complaint.  This was an attempt to get Kensu transferred away from Macomb because of his professional relationship between Kensu and HUM Heather Cooper.

449.     At the time of the alleged PREA violation, Steece was interested in dating HUM Cooper and did not like that HUM Cooper spent time with Kensu trying to assist Kensu in receiving timely and necessary treatment for his serious medical needs.

450.     As a result of this fabricated complaint, Kensu was no longer permitted to see HUM Cooper.  This interfered with Kensu's receipt of necessary treatment for his serious medical needs.

### U. Defendant Steward's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

451.     Defendant Steward is a deputy at the Macomb Correctional Facility.

452.     Steward was aware of Kensu's serious medical conditions.

453.     Steward, in conjunction with Defendants Haas and Stephenson confiscated medical items that had been approved by Kensu's medical providers.

454.   Steward, Stephenson, Haas, and Steece manipulated the hearing process preventing Kensu from access to these approved medical items.

455.   By confiscating Kensu's medical equipment with knowledge of Kensu's serious medical needs, Stephenson was deliberately indifferent to Kensu's medical care.

## V. Defendant Kissau's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

456.   Defendant Kissau has taken an active role in retaliating against Kensu for his verdict by, among other things, ensuring that he did not receive adequate medical treatment for his serious medical needs.

457.   Defendants Gulick and Borgerding had complete control and oversight over Plaintiff's care, and all of the denials of care that Plaintiff Kensu was subjected to. Defendant Kissau reported to Gulick and was the direct supervisor of HUM Heather Cooper.

458.   HUM Cooper sent Defendants Gulick and Borgerding DOZENS of memos and emails on the subject of Plaintiff Kensu's care, including constantly asking them to provide specific answers to questions about his serious medical needs, requests to pay for his care, and requests to outline exactly what type of care Plaintiff would be permitted to obtain or pay for.   Defendants Gulick and Borgerding routinely refused to provide any clear answers.   Defendant Kissau was also copied on many of these emails and failed to act to see that Kensu was provided with treatment for his serious medical needs.

459.   In addition, Defendant Gulick advised her subordinates not to communicate

concerning Kensu in writing so that there was no paper trail of these communications.  Such a directive had no legitimate medical purpose.  Defendant Kissau communicated this directive to HUM Cooper and in doing so, adopted the action of Gulick.

### W. Defendant Adray's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

460.    Defendant Adray was a Physician's Assistant at the Macomb Correctional Facility.

461.    Both before and after June 30, 2017, Adray had direct involvement with Kensu.

462.    Both before and after June 30, 2017, Adray treated Kensu and was aware of Kensu's serious medical needs.

463.    While Kensu was at the Thumb Correctional Facility in 2012-2014, Kensu repeatedly filed grievances against Adray for her refusal to provide care to Kensu. Furthermore, Adray repeatedly threatened and harassed Kensu.

464.    After 2014, Adray was transferred to Macomb as was Kensu.  While at Macomb, Adray has incited other staff members to not treat Kensu's serious medical needs in retaliation for Kensu's grievances.

465.    Despite being fully aware of Kensu's medical complaints, Adray denied or unreasonably delayed the treatment of Kensu's serious medical needs.

### X. Defendant Fortescue's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

466.   Defendant Fortescue acted in conjunction with Defendant Steece as discussed above in the section on Defendant Steece.

### Y. Defendant Tyree's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

467.   Defendant Tyree was a Physician's Assistant at the Saginaw Correctional Facility.

468.   Before June 30, 3017, Tyree treated Kensu and was aware of Kensu's serious medical needs for conditions that were diagnosed after June 30, 2017.

469.   Despite being fully aware of Kensu's medical complaints, Tyree denied or unreasonably delayed the treatment of Kensu's serious medical needs.

470.   Tyree's refusal to treat Kensu caused delays in diagnosing conditions discussed above that were finally diagnosed after June 30, 2017.  In effect, Tyree stuck his head in the sand and ignored Plaintiff's medical complaints.

471.   Plaintiff did not previously bring suit against Tyree for conditions diagnosed after June 30, 2017, because he had not yet been diagnosed with those conditions at the time of previous lawsuits.

### Z. Defendant Buskirk's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

472.   Defendant Buskirk was a Physician's Assistant at the Saginaw Correctional Facility.

473.   Before June 30, 3017, Buskirk treated Kensu and was aware of Kensu's serious medical needs for conditions that were diagnosed after June 30, 2017.

474.   Despite being fully aware of Kensu's medical complaints, Buskirk denied

or unreasonably delayed the treatment of Kensu's serious medical needs.

475.    Buskirk's refusal to treat Kensu caused delays in diagnosing conditions discussed above that were finally diagnosed after June 30, 2017.  In effect, Buskirk stuck his head in the sand and ignored Plaintiff's medical complaints.

476.    Plaintiff did not previously bring suit against Buskirk for conditions diagnosed after June 30, 2017, because he had not yet been diagnosed with those conditions at the time of previous lawsuits.

## AA.    Defendant Couturier's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

477.    Defendant Couturier was a Physician's Assistant at the Thumb Correctional Facility.

478.    Before June 30, 2017, Couturier treated Kensu and was aware of Kensu's serious medical needs for conditions that were diagnosed after June 30, 2017.

479.    Despite being fully aware of Kensu's medical complaints, Couturier denied or unreasonably delayed the treatment of Kensu's serious medical needs.

480.    Couturier's refusal to treat Kensu caused delays in diagnosing conditions discussed above that were finally diagnosed after June 30, 2017.   In effect, Couturier stuck his head in the sand and ignored Plaintiff's medical complaints.

481.    Plaintiff did not previously bring suit against Couturier for conditions diagnosed after June 30, 2017, because he had not yet been diagnosed with those conditions at the time of previous lawsuits.

## BB.    Defendant Rodger's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct

482.    Defendant Rodgers is a dietician at the Gus Harrison Correctional Facility.

483.    Rodgers had direct involvement with Kensu and was in part responsible for his dietary needs.

484.    Rodgers knew Kensu's serious medical needs and was aware of his dietary requirements.  Furthermore, Rodgers was aware that Kensu had been prescribed specific diets by his treaters.

485.    Despite orders for specific dietary needs, Rodgers conspired and acted with other Defendants to deny Kensu his necessary and prescribed diet.

486.    Through a consistent campaign in violation of Kensu's rights and with deliberate indifference to Kensu's serious medical needs, Rodgers has blocked Kensu from receiving a diet adequate to sustain normal health as modified by Kensu's healthcare professionals.

**CC.  Defendant Jenkins-Grant's Deliberate Indifference to Plaintiff Kensu's Serious Medical Needs and Disregard for His Protected Conduct**

487.    Defendant Jenkins-Grant is the residential unit manager where Kensu is housed and she is also the direct supervisor of Defendant Jenkins.

488.    Jenkins-Grant's conduct is described in the section above concerning Defendant Jenkin's conduct.

### CAUSES OF ACTION

### COUNT I
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
**First Amendment – Retaliatory Post-Verdict Denial of Medical Care**
(*Against All Defendants*)

489.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

490.    At all times relevant, Plaintiff had a clearly established right under the First Amendment to the United States Constitution to engage in protected conduct, including the filing of grievances, filing of lawsuits, and obtaining a verdict against five MDOC officials.

491.    Plaintiff engaged in Constitutionally protected conduct, including filing grievances, filing lawsuits, and obtaining a verdict against five MDOC officials.

492.    Kensu's verdict against the MDOC officials was well known within the MDOC and Corizon.  Each of the Defendants in this matter was aware of the above verdict.

493.    In retaliation and as punishment for this conduct, Defendants have intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently refused to provide Plaintiff with adequate medical care.

494.    Such retaliation would serve as a deterrent to a person of ordinary firmness from engaging in protected conduct.

495.    The retaliation was motivated at least in part by the protected conduct.

496.    There was a causal connection between Plaintiff's Constitutionally protected conduct and the adverse retaliatory actions taken by the defendants against Plaintiff.

497.    Defendants intentionally deprived Plaintiff of adequate medical care. Additionally, Defendants' conduct deprived him of medical care without his consent, probable cause, legal justification, medical justification, just cause, or any

other legally valid reason.

498.    Defendants' intentional deprivation of adequate medical care and deliberate indifference to Plaintiff's serious medical needs includes, but is not limited to, actions such as:

> A. Instituting a policy, practice, or custom of denying medical care to Plaintiff for his serious medical needs;
>
> B. Removing, blocking, or confiscating medical devices used to treat Plaintiff's serious medical needs and other personal property, without due process of law;
>
> C. Falsifying medical records;
>
> D. Blocking access to the grievance process through falsifying records and other wrongful conduct, thereby unreasonably blocking Kensu's access to the Courts;
>
> E. Issuing conspiratorial tickets to Plaintiff to justify placing him in a higher security level;
>
> F. Denying or unreasonably delaying Plaintiff access to specialists or experts to treat his serious medical needs.

499.    As a direct and proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

### COUNT II
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Eighth Amendment – Deliberate Indifference to Serious Medical Needs

(*Against All Defendants*)

500.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

501.    At all times relevant, Plaintiff had a clearly established right under the Eighth Amendment to the United States Constitution to be free from deliberate indifference to his known serious medical needs.

502.    At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

503.    At all times relevant, Defendants knew that Plaintiff had serious medical needs as discussed above.

504.    Defendants denied treatments altogether, allowed current treatments to lapse, delayed in providing treatments, or attempted to remove current treatments. Defendants are categorically refusing to adequately treat these serious medical needs, such that it rises to the level of deliberate indifference to Kensu's serious medical needs.

505.    The Eighth Amendment of the U.S. Constitution provides, in pertinent part, that cruel and unusual punishments not be inflicted.

506.    Defendants' actions and inactions constituted deliberate indifference to Plaintiff's serious medical need in violation of 42 U.S.C. § 1983 and his rights under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment.  Such instances of deliberate indifference include, but are not limited to:

        A. Instituting a policy, practice, or custom of denying medical care to

Plaintiff for his serious medical needs;

B. Removing, blocking, or confiscating medical devices used to treat Plaintiff's serious medical needs and other personal property, without due process of law;

C. Falsifying medical records;

D. Denying or unreasonably delaying Plaintiff access to specialists or experts to treat his serious medical needs.

E. Wrongfully, without any medical basis, denying Kensu treatments for his serious medical needs as discussed above.

507.   Defendants' decision to withhold appropriate medical care and treatment from Plaintiff as described herein with deliberate indifference to Plaintiff's serious medical needs, while Plaintiff was in the MDOC's custody, violated his constitutionally protected rights.

508.   Despite being informed of Plaintiff's serious medical needs, and presented with medical opinions confirming serious medical needs requiring immediate treatment, Defendants, with deliberate indifference to those needs, denied Plaintiff necessary medical treatment.

509.   Defendants acted with deliberate indifference when they refused to authorize proper treatment, instead intentionally providing the less efficacious treatment or no treatment at all.

510.   Since Plaintiff was denied adequate treatment, his conditions have predictably steadily declined in the care of the Defendants.  Defendants have ignored thousands of kits, grievances, complaints of pain, and requests for care,

despite knowing that immediate treatment was necessary and that Plaintiff's untreated medical needs were producing physical abnormalities.

511.    Defendants, with deliberate indifference to Plaintiff's serious medical needs, knowingly failed to examine, treat, and/or care for Plaintiff's serious medical condition.

512.    Defendants did so despite their knowledge of Plaintiff's serious medical needs, thereby placing him at risk of serious physical harm from untreated injuries. Defendants were aware that Plaintiff faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

513.    As a direct and proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### First and Fourteenth Amendment Retaliation – Deprivation of Property
### *(Against Defendants Jenkins-Grant, Jenkins, Russell, Lacy, Bomber, Gulick, Stephenson, Steward, Steece, Borgerding, Martin, Coleman, Papendick, and Schmidt)*

514.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

515.    At all times relevant, Plaintiff had a clearly established right under the First Amendment to the United States Constitution to engage in protected conduct, including the filing of grievances, filing of lawsuits, and obtaining a verdict against five MDOC officials.

516.    Plaintiff engaged in Constitutionally protected conduct, including filing grievances, filing lawsuits, and obtaining a verdict against five MDOC officials.

517.    In retaliation and as punishment for this conduct, Defendants have intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently seized Plaintiff's property.

518.    Defendants intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently seized this property without a lawful basis in violation of Plaintiff's right to due process.

519.    Specifically, Defendants seized necessary medical accommodations assigned, recommended, given to, and/or purchased by Plaintiff Kensu to treat his serious medical needs as discussed above.

520.    Furthermore, Defendants retaliated against Plaintiff Kensu by seizing non-medical items, including, but not limited to, boxes Kensu used to keep his legal documents in.

521.    The retaliatory seizures of Plaintiff's property were based on Defendants knowing, deliberate, and reckless disregard for Plaintiff's rights. Further, Defendants had no knowledge of any fact or circumstance which would lead a reasonable person to believe that Plaintiff committed any offense whatsoever to justify the seizures.  There was no legitimate reason to seize Kensu's property.

522.    Such retaliation would serve as a deterrent to a person of ordinary firmness from engaging in protected conduct.

523.    The retaliation was motivated at least in part by the protected conduct.

524.    There was a causal connection between Plaintiff's Constitutionally

protected conduct and the adverse retaliatory actions taken by the Defendants against Plaintiff.

525.   Defendants intentionally deprived Plaintiff of his property. Additionally, Defendants' conduct deprived him of his property without his consent, probable cause, legal justification, medical justification, just cause, or any other legally valid reason, and without due process of law.

526.   As a direct and proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Supervisory Individual Liability**
(***Against Defendants Corizon, Schmidt, Papendick, Coleman, Martin, Borgerding, Haas, Gulick, Bomber, Lacy, Russell, and Warren***)

527.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

528.   A supervisor is individually liable under 42 U.S.C. § 1983 if the supervisor implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

529.   As described herein, MDOC and Defendant Corizon employees and/or contractors violated Plaintiff's constitutionally protected right to adequate medical care and to be free from deliberate indifference to known serious medical needs when Plaintiff was denied adequate medical treatment for his serious medical needs, even though numerous tests, laboratory results, MRIs, X rays, blood tests,

numerous other results and examinations, and physician recommendations confirmed and outlined the necessary medical treatment required to treat Plaintiff's serious medical needs.

530. At all times relevant to this complaint, Defendants Schmidt, Papendick, Coleman, Martin, Borgerding, Haas, Gulick, Bomber, Lacy, Russell, and Warren ("Supervisory Defendants") were supervisors acting under the color of law in their actions and omissions. The Supervisory Defendants at least implicitly approved, authorized, or acquiesced in the deliberate indifference exhibited by their subordinate defendants named herein.

531. All other individual defendants were acting under the direct supervision of the Supervisory Defendants. The Supervisory Defendants established polices for their subordinates to follow, which required Plaintiff to be treated with deliberate indifference to his serious medical needs, including denying Plaintiff adequate medical treatment.

532. Supervisory Defendants Borgerding, Coleman, Haas, Gulick, Russell, and Warren were at all pertinent times acting in their capacities as supervisors acting under the color of law in their actions and omissions and were responsible for the supervision, discipline, and control of all MDOC medical employees and contractors who unlawfully violated Plaintiff's constitutional rights. In their role as supervisors, they at least implicitly approved, authorized or acquiesced in their subordinates' misconduct.

533. At all times relevant to this complaint, Supervisory Defendant Bomber, Lacy, Martin, Schmidt, and Papendick were supervisors acting under the color of

law in their actions and omissions and were acting in their capacities as supervisors of Corizon treaters. As supervisors, they were responsible for the supervision, discipline, and control of all Corizon employees who unlawfully violated Plaintiff's constitutional rights. In their role as supervisors, they at least implicitly approved, authorized or acquiesced in their subordinates' misconduct.

534.    The Supervisory Defendants had direct knowledge of the inadequacy of their supervision of MDOC employees and/or contractors, and/or Corizon employees/contractors, and failed to make necessary changes to ensure that adequate treatment was provided for the known serious medical needs of Plaintiff, thereby demonstrating deliberate indifference in violation Plaintiff's constitutionally-protected rights. They also actively participated in the mistreatment of Plaintiff by denying Plaintiff required medical treatment.

535.    As a result of Supervisory Defendants' actions and inactions, they exhibited deliberate indifference to Plaintiff's medical needs in violation of 42 U.S.C. § 1983 and his rights under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Monell – Policy of Deliberate Indifference by Corizon
### (*Against Defendant Corizon*)

536.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

537.    A corporation, municipal or otherwise, is liable under 42 U.S.C. § 1983 if the acts that violated a person's rights are attributable to its own policies, practices,

and customs.

538.    At all times relevant to this complaint, Defendant Corizon's policy makers and decision makers maintained policies and practices that condoned and fostered the unlawful conduct of their unnamed employees contracted to work in the MDOC, thereby demonstrating deliberate indifference to the constitutional rights of inmates.

539.    Defendant Corizon has a policy to deny at least 90% of surgery requests, regardless of medical necessity. This policy is not for any medical purpose. On the contrary, it is only to increase Corizon's profits. Such a policy and/or action and/or inaction by doctors charged with treating patients demonstrates clear deliberate indifference to Plaintiff and directly caused Plaintiff's complained-of injuries.

540.    Defendant Corizon has a pattern, practice, policy, and custom of providing inadequate medical care to prisoners housed in jails and correction facilities nationwide.

541.    Defendant Corizon, through its employees, officers, and agents, routinely acted according to a plan or policy to deny Plaintiff and other prisoners access to treatment for their serious medical needs.

542.    Defendant Corizon, through its employees, officers, and agents, acted to approve of the abuse and denial of Plaintiff and other prisoners' constitutionally protected access to treatment for their serious medical needs.

543.    Defendant Corizon's plan or policy to unreasonably deny prisoners access to adequate medical treatment for their serious medical needs is evidenced across a long history of numerous claims, lawsuits, and grievances.

544.    Defendant Corizon instituted this policy, practice, or procedure to unreasonably deny prisoners access to adequate medical treatment for their serious medical needs to save money, among other reasons.

545.    Hundreds, if not thousands of causes of action have been filed throughout the United States against Corizon.

546.    In these causes of action, the common allegation was Defendant Corizon's deliberate indifference to the medical needs and care of prisoners detained in the correctional facilities where Corizon was responsible for providing medical and mental health services.

547.    Evidence of Corizon's pattern, practice, policy, and custom of deliberate indifference to the treatment of prisoners is widespread and affects prisoners across the country.

548.    Keith Papendick, Corizon Utilization Manager, states that Corizon does not deny.  They "defer."  Rather than outright "deny" treatment, Corizon "defers" the treatment.  This "deferral" has the same substantive effect on the patient as an outright denial.  The patient never receives the treatment.  This policy, practice, or custom of "deferring" requests is in deliberate indifference to a prisoner's serious medical needs.

549.    As discussed above, hen P.A. McKissick says the policy to deny 90% to 99% of all requests, she means that 90% to 99% of all requests are "deferred."

550.    McKissick further testified that all of her recommendations for a consultation with a specialist were based upon her experience as a physician's assistant and the standard of care necessary to properly treat the patient. Corizon

"deferred" those recommendations, the recommendations of a physician for treatment necessary to provide adequate healthcare to a patient for their serious medical needs, 90% to 99% of the time.

551.    Defendants have one single individual, Keith Papendick, who reviews requests for care by treating health care providers.  On an average day, he reviews more than 100 requests for care which means he spends, on average, less than five minutes on each case.  In doing his review, he does not review the medical records of the patients, but only the request completed by the prisoner's treating physician. If that request does not contain information that Papendick believes is necessary, he simply "defers" the request.  The effect of a "deferral" is to deny the prisoner the requested care.

552.    If a treater has the time, a treater can respond to the "deferral".  Because of the workload of the treaters at the facilities, this is often difficult or impossible.  A treater can also appeal the decision, but once again, this requires time which the treaters do not have given the workload.   According to Marianne McKissick discussed above, she was unaware that there was an appeal process and never appealed those "deferral" decisions.

553.    During the time of Corizon's contract with the MDOC, Corizon was directly responsible for the treatment of Plaintiff, and has at the very least implicitly approved, authorized, or acquiesced in the deliberate indifference to Plaintiff's serious medical needs. Defendant Corizon leads by example, so to speak, by allowing and encouraging their subordinates to be deliberately indifferent to prisoners' serious medical needs, as is demonstrated by numerous verdicts across

the country against Corizon finding them both liable for deliberate indifference violations and awarding both compensatory damages as well as punitive damages to plaintiffs. These verdicts, however, did not have the desired effect declared by the legislature's purpose in enacting punitive damages in civil rights cases, since it did not deter them or others from engaging in similar misconduct.

554.    Defendant Corizon could have authorized Plaintiff's required treatments needed to address his serious medical needs but chose not to out of deliberate indifference to Plaintiff's serious medical needs. Corizon chose to let Plaintiff suffer and actively participated in the mistreatment of Plaintiff by "deferring" Plaintiff's required medical treatment.

555.    Defendant Corizon has a policy, practice, or custom to "defer" at least 90% of surgery requests, regardless of medical necessity. Further, Defendant Corizon has a policy, practice, or custom to deny any surgery request that requires an overnight stay. These policies are not for any medical purpose. On the contrary, it is only to increase Corizon's profits. Such a policy, practice, or custom of action and/or inaction by doctors charged with treating patients demonstrates clear deliberate indifference to Plaintiff and directly caused Plaintiff's complained-of injuries.

556.    Defendant Corizon has policies, practices, and customs of providing inadequate medical care to prisoners housed in jails and correction facilities nationwide.

557.    Defendant Corizon, through its employees, officers, and agents, routinely acted according to a plan or policy to deny Plaintiff access to treatment for their

serious medical needs.

558.    Defendant Corizon, through its employees, officers, and agents, acted to approve of the abuse and denial of Plaintiff's constitutionally protected access to treatment for their serious medical needs.

559.    At all times relevant to this complaint, Defendants Bomber, Lacy, Martin, Schmidt, and Papendick were the policymaker(s) and/or decision maker(s) for Defendant Corizon, and enacted policies, procedure, customs, and/or protocols which demonstrated deliberate indifference to Plaintiff's known serious medical needs through their refusal to authorize necessary medical treatment for Plaintiff's serious medical needs, refusing to provide proper medical treatment to Plaintiff over several years, despite knowledge that treatment was necessary. Further, Corizon had a policy, either written or unwritten, to deny medically necessary surgeries, in blatant violation of the Eighth Amendment, simply to increase profits at the painful expense of inmates, including Plaintiff.

560.    As a result of Defendant Corizon's policy of deliberate indifference to known serious medical needs, Plaintiff's right to receive medical treatment was predictably violated as outlined herein.

561.    In the alternative, at all pertinent times, Defendant Corizon failed to properly train its treaters on the standards of proper medical treatment for known serious medical needs, thereby demonstrating deliberate indifference to Plaintiff's rights. This failure to train included the failure to train its employees and/or contractors to approve necessary medical treatment, such as the treatments required by Plaintiff. Defendants, by denying Plaintiff access to adequate medical treatment,

showed such a lack of that a training

562.     Corizon's training program, or lack thereof, was inadequate to the tasks that its employees/contractors were required to perform.  The inadequacy was the result of Corizon's deliberate indifference to Plaintiff's serious medical needs and the inadequacy caused or contributed to Plaintiff's injuries.

563.     As a result of Defendant Corizon's complained of failures to properly train its employees on the standard of treatment of serious medical needs, Plaintiff suffered predictable harm.

<u>**COUNT VI**</u>
<u>**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**</u>
**Conspiracy to Deprive of Rights**
(***Against All Defendants***)

564.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully copied and set forth at length herein.

565.     At all times relevant, Plaintiff had a clearly established right to be free from conspiracy to violate his constitutional right to medical care for his serious medical needs, as well as the right to be free from retaliation for engaging in protected conduct.

566.     At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

567.     Defendants agreed not to be deliberately indifferent to a person's serious medical needs.

568.     Defendants agreed not to retaliate against a person for that person's engagement in protected conduct.

569.   Defendants were deliberately indifferent to Plaintiff Kensu's serious medical needs as they followed a policy, plan, or practice of ignoring one's serious medical needs to save money.

570.   Defendants retaliated against Plaintiff Kensu for his engagement in protected conduct.

571.   Defendants knew that Plaintiff Kensu had many serious medical needs.

572.   Defendants conspired together to violate Kensu's rights concerning treatment for his serious medical needs.

573.   The exact role of each Defendant is known only to Defendants.

574.   Each Defendant's conduct was known to the other Defendants.

575.   Each Defendant adopted the conduct of the other Defendants.

576.   Defendants' actions and inactions constitute an impermissible conspiracy to deprive an individual of their right to medical care for their serious medical needs in violation of 42 U.S.C § 1983 and the Eighth Amendment to the United States Constitution.

577.   Defendants' actions and inactions constitute an impermissible conspiracy to deprive an individual of their right to be free from the deprivation of life, liberty, or property without due process of law in violation of 42 U.S.C § 1983 and the Fourteenth Amendment to the United States Constitution.

578.   Defendants' actions and inactions constitute an impermissible conspiracy to deprive an individual of their right to be free from retaliation for engaging in protected conduct in violation of 42 U.S.C § 1983 and the First Amendment to the United States Constitution.

579.    As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his physical, mental, and emotional injury, pain, mental anguish, humiliation, and embarrassment.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

A. Compensatory damages in an amount which is fair, just, and reasonable;

B. Punitive and/or exemplary damages in an amount which is fair, just, and reasonable;

C. Injunctive relief to secure access to care necessary to address Plaintiff's medical, religious, property-related, and all other needs;

D. Injunctive relief to ensure Plaintiff's rights under the First, Eighth, and Fourteenth Amendments are not being violated by Defendants or their cohorts;

E. Entry of a declaratory judgment stating that Defendants' practices, acts, and omissions violated Plaintiff's rights guaranteed to him by the First, Eighth, and Fourteenth Amendments;

F. The immediate return to Plaintiff of his medical devices and all other property taken while at MRF in violation of Plaintiff's constitutional rights;

G. Permission to receive safe, non-drug, natural health items from legitimate businesses;

H. The immediate cessation of retaliatory transfers and Court oversight over any future facility transfers;

I. Plaintiff's Gluten-free, Dairy-free, Artificial sweetener-free diet and "6 small feedings/snack bag" will be immediately restored;

J. The immediate return of Plaintiff's medical property including support devices, inversion cuffs, back belt, water bottle, sun-protective hat, ankle/elbow/knee braces, supportive boots, Gel Insoles, and other property;

K. The immediate reinstatement of Retin-A, Panoxyl, Multivite/Mineral Formula, Vitamin D, Magnesium/Calcium, and Probiotics at the same dosages as before they were terminated by Defendants;

L. Immediate access to an orthopedist of Plaintiff's reasonable choice for treatment of Plaintiff's knees shoulders and other orthopedic needs, with an order that Defendants must abide by and pay for all treatment prescribed by such orthopedist, including the referral of such orthopedist to other doctors including specialists whose prescribed treatments must also be followed;

M. Immediate access to a primary care doctor or internist to thoroughly examine Plaintiff to determine what other treatment Plaintiff requires and what other specialists, if any, Plaintiff needs to see, and an order that Defendants must abide by and pay for all such treatment plans;

N. Such other relief as this Court may deem appropriate, including costs, interest, and attorneys' fees pursuant to 42 U.S.C. §1983.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial on all claims so triable in this action.

Respectfully Submitted,

EXCOLO LAW, PLLC

Dated: March 24, 2020

*/s/ Keith Altman*
Keith Altman (P81702)
Solomon M. Radner (P73653)
Albert J. Asciutto (P82822)
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 939-2656

*Attorneys for Plaintiff*